**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SUSAN B. LONG and DAVID BURNHAM, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:14-cv-0109 Judge John D. Bates |
| IMMIGRATION AND CUSTOMS ENFORCEMENT and CUSTOMS AND BORDER PROTECTION, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF PAUL C. CLARK, D.Sc.**

I, Paul C. Clark, D.Sc., hereby declare as follows:

1.  I am President and Chief Technology Officer of SecureMethods, Inc. and Paul C. Clark, LLC. SecureMethods designs, implements, and deploys advanced secure network applications for commercial and government clients to ensure that these entities can perform their business processes securely. I oversee the development, operations, marketing, and sales functions with respect to the security products that SecureMethods creates. I also consult with our clients on issues pertaining to database security and other computer systems.

2.  I earned a B.S. in Mathematics from the University of California, Irvine (1986), an M.S. in Electrical Engineering and Computer Science from the University of Southern California (1988), and a D.Sc. in Computer Science, with a concentration in security, graphics, and intellectual property law, from The George Washington University (1994).

3. I previously have served as the Chief Scientist at DynCorp Network Solutions (January 1995 – July 1999), Senior Security Engineer at Trusted Information Systems (September 1990 – January 1995), Technical Lead at GTE Government Systems (November 1989 – September 1990), and Systems Engineer at Ultrasystems Defense and Space (May 1985 – November 1989).

4. My past work experience includes designing secure databases and other data storage systems and designing and implementing security protocols. Among other things, I invented the Boot Integrity Token System (BITS) to protect computer systems from viruses and other threats that can occur during the computer's startup process. BITS is designed so that the computer boots from information securely stored on a smart card (a credit card sized device that provides an additional layer of security before access to a system is allowed by requiring both physical possession of the smart card and knowledge of a password). This process allows the user to trust the correct functionality of a local computer. My other patents pertain to extending trust across untrusted networks and the secure access and transfer of data between domains. I also have designed and created secure software products that have been marketed and sold commercially and to the federal government, including the Department of Defense, to provide secure access to highly sensitive data.

5. I have published on issues concerning secure data access and exchange. I also have spoken extensively on data security in networked computer environments. I served on a federal advisory committee for key management infrastructure, and worked with the National Institute of Standards and Technology (NIST) to develop elements of a public key infrastructure in cooperation with industry representatives. I teach doctoral level cryptography and computer security courses at The George Washington University. I also have served as a testifying expert

on data security issues in a number of lawsuits as well as before Congress. A copy of my curriculum vitae is attached as Exhibit N (this is sequential to exhibits attached to the Declarations of Jehan A. Patterson and Susan B. Long).

6.  Through my academic and professional activities, I am familiar with, and knowledgeable about, issues relating to the threats posed to computer databases and other systems and how to design and implement security protocols, policies, and procedures to protect against those risks. I also have extensive familiarity with industry-wide best practices concerning data security, and the steps that federal agencies take to secure their data against unauthorized access.

7.  I have reviewed the Declarations of Karolyn Miller, Fernando Pineiro, and Jeff Wilson, and the Vaughn indices submitted by Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) during the course of this litigation. I also have reviewed the January 14, 2010, Privacy Impact Assessment for the Enforcement Integrated Database (EID).

8.  Based on my professional experience, I make the following observations with respect to defendants' arguments that disclosing certain records requested by plaintiffs at issue—namely, the names of database tables and fields, schema, software information, and various technical documents for the EID and ICE's Integrated Decision Support (IIDS) database—will place defendants' databases at risk of a cyber-attack:

**Names of Database Tables and Fields, Schema, and Software Information**

9.  I understand that defendants contend that their databases will be susceptible to a cyber-attack, most likely by means of a Structured Query Language (SQL) injection attack, if the names of database tables and fields and schema are disclosed. Specifically, the defendants argue

that an attacker could use, for example, the names of the database tables and fields to write SQL code that instructs the query processor to perform undesirable operations—e.g., requesting the database management software (DBMS) to delete data in a field or even delete a table of data entirely through a web application.

10. As a data security professional, I evaluate the risk of an attack, which is an exploitation of a threat, by first assessing the threat. If there is no credible threat, then there is no viable risk of attack.

11. A SQL injection attack is a type of remote execution attack. In other words, someone who is not physically on the premises where a computer system is located nonetheless can launch an attack by transmitting malicious instructions through a web interface that has a direct connection to a database that will accept and execute such instructions. For at least two reasons, remote execution is not a credible threat to the EID or IIDS systems.

12. First, as the Privacy Impact Assessment for the EID makes clear, there is no publicly accessible web interface to the EID or IIDS, nor do agencies outside of the Department of Homeland Security (DHS) have access to the database systems. *See* Patterson Decl. ¶ 2 & Ex. A at 15, 22. Thus, the only threat to these systems would be posed by DHS employees and contractors with access to a direct connection to the EID. As these personnel can already access the names of the database tables and fields and the schema (how the records within the database are linked) by virtue of their access to the database, disclosure of this information to the public poses no increased threat.

13. Second, if defendants follow best practices for data security, the database would use only stored procedures that employ a predefined sequence of instructions that cannot be altered by a user, or at least would not be configured to execute *any* instructions it receives

without first validating the commands. This would be true even if there were a publicly available web interface, which there is not. Defendants explain in the EID Privacy Impact Assessment that they have implemented firewalls to protect their database from unauthorized intrusions. Patterson Decl. ¶ 2 & Ex. A at 28. With firewalls in place, no direct access to the database by the public is possible, and so disclosure of the requested structure poses no additional threat to defendants' databases. Further, no database administrator aware of such threats would deploy a database application that accepts arbitrary input for execution. Instead, databases are designed to prevent these types of remote execution attacks by employing stored procedures and/or input validation techniques that ensure users cannot execute a command for which they do not have a privilege. Although defendants do not explicitly state whether they employ these countermeasures, the Privacy Impact Assessment for the EID describes a number of other extensive security measures that defendants take, such as the use of strong passwords that are not easily determinable, automatic session and account lockouts, limitations on user access, and network security monitoring, that embody best practices. Patterson Decl. ¶ 2 & Ex. A at 27-28. Moreover, in its most recent annual performance report, DHS describes its "[c]omprehensive monitoring" of its computer systems to "proactively stop[] and captur[e] malicious code …." Patterson Decl. ¶ 6 & Ex. E at 78. These statements strongly suggest that, being aware of attacks such as SQL injection attacks, defendants very likely take precautions to ensure that their databases would employ stored procedures or reject any unauthorized SQL query that even an internal user attempted to transmit.

14.    Because disclosure of this information in the requested records would not create any new or increased threat to defendants' databases, disclosure accordingly will not pose a risk of attack.

5

15. Defendants' rationale for withholding this information appears to be premised on a security principle referred to by professionals as "security through obscurity." This is the notion that a computer system is harder to attack if details concerning the system are kept secret. "Security through obscurity" has not been accepted as a best practice for data security during my over two decades of experience. It is a far superior method of data security, for example, to disclose an algorithm to be used by a server to encrypt data, thus rendering that algorithm susceptible to testing, prior to deployment, than it is to keep the encryption algorithm a secret and hope that it will never be discovered. In fact, the information security standards promulgated by the NIST for federal government networks make clear that "[s]ystem security should not depend on the secrecy of the implementation or its components." Karen Scarfone, Wayne Jansen, & Miles Tracy, *Guide to General Server Security: Recommendations of the National Institute of Standards and Technology*, Special Pub. 800-123, at 2-4 (July 2008).[1]

16. Accordingly, although defendants fear that disclosing the type and version of the software used to construct the databases "allows an attacker to craft database specific attacks" and that an "attacker often needs to know database schema information … [t]o correctly extract data from a database," Miller Decl. ¶ 18, keeping this information secret contravenes best practices for data security. And for the reasons discussed above in paragraphs 12 through 15, disclosure of these records poses no threat and creates no viable risk of an external attack on the databases.

17. Defendants' statement that knowledge of the names of the database tables and fields and schema is akin to knowledge of the combination to a safe, *see* Miller Decl. ¶ 11, is not credible for at least the reasons explained above. Instead, knowing this information is more akin

---

[1] *Available at* http://csrc.nist.gov/publications/nistpubs/800-123/SP800-123.pdf.

to knowing the type of combination lock on a safe within a facility to which one cannot gain access. Knowing the type of lock provides no increased risk that the safe's contents will be destroyed within the inaccessible facility.

**Technical Documentation of the EID and IIDS**

18.  I have also reviewed the Vaughn indices, which set forth a number of specific reasons for withholding various records on the same grounds that disclosure will make the databases susceptible to attack. I want to address briefly defendants' arguments for withholding the records listed on their Vaughn indices. As a first matter, none of the alleged threats identified may be exploited by anyone other than DHS insiders as discussed above. For completeness, I will address some exemplary Vaughn entries and deficiencies in defendants' arguments.

19.  Defendants withheld certain records containing information about system outage or system down times because they contend that "[w]hen the system is experiencing an outage, potential intruders could overwhelm the system and potentially slow down or crash it." Patterson Decl. ¶ 5 & Ex. D at Entry No. 4; *see also, e.g.*, *id.* at Entry Nos. 9, 16, 18, 40, 71. However, a system is never more secure than when it is unplugged and/or offline as intruders would be unable to launch an attack on a system that is experiencing an outage.

20.  Defendants contend, among other things, that disclosure of records containing: (1) system test results, system flaws, or configuration information, *see, e.g.*, Patterson Decl. ¶ 5 & Ex. D at Entry Nos. 14, 29, 51, 52, 74; (2) the sequence and nature of tasks necessary to determine system readiness, *See, e.g.*, *id.* at Entry Nos. 27, 86, 97; (3) information about the system architecture or hardware and software details, *see, e.g.*, *id.*, Entry Nos. 43, 153 (4) detailed migration procedures or backup plans, *see, e.g., id.*, Entry Nos. 89; (5) source code files or libraries, *see, e.g.*, *id.*, Entry No. 103; (6) descriptions of how to use the system, including

7

information about the design and functionality of the system, *see, e.g.*, *id.*, Entry Nos. 82, 90-96; (7) Internet Protocol (IP) addresses, usernames, and SQL code, *see, e.g.*, *id.*, Entry No. 107; or (8) security information such as authentication, password capabilities, access control, and auditing, *see, e.g.*, *id.*, Entry No. 108, could be used to exploit system vulnerabilities. For the reasons set forth above in paragraphs 12 through 15, disclosure of this information creates no new threat to the security of the database and, therefore, no increased risk of attack.

21.     Defendants also withhold a number of records that identify table names, fields, or even other systems that interact with defendants' databases, *see* Peneiro Decl. Ex. 26 (all entries), on the grounds that knowing the names "allows a potential intruder to modify or delete data." Patterson Decl. ¶ 5 & Ex. D at Entry No. 6; *see also, e.g.*, *id.*, Entry Nos. 20, 25, 75, 97. For the reasons set forth above in paragraphs 12 through 15, disclosure of this information creates no new threat to the security of the database and, therefore, no increased risk of attack.

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct.

Executed in Bethesda, Maryland on November 13, 2014.

                                                                          /s/ Paul C. Clark
                                                                          Paul C. Clark

# EXHIBIT N

Declaration of Paul C. Clark

*Long v. Immigration & Customs Enforcement*

No. 1:14-cv-0109 (JDB)

**PAUL C. CLARK**

*4705 Broad Brook Drive, Bethesda, Maryland, 20814*
*703.628.9500*
*paul@securemethods.com*

| | |
|---|---|
| **SKILLS SUMMARY** | A senior executive with extensive IT design, development and deployment experience, Dr. Clark has twenty five years of direct technical and management experience in the computer and systems engineering environment.  He is the President of Paul C. Clark LLC.  His specialties include complex commercial development and deployment of scalable secure network and data processing systems. He has served as keynote speaker, expert witness for high profile commercial clients and before Congress. He has served on federal advisory committees and as an adjunct professor at The George Washington University. |

**EMPLOYMENT**  **President and CTO**  July 1999 – Present
**SecureMethods Inc. / Paul C. Clark LLC**
*Bethesda, MD*

- Serves as Managing Director
- Manages operations and sales staff.
- Manages commercial product development staff.
- Provides product design, development and deployment guidance.
- Provides sales engineering support and collected customer feedback.
- Defines and communicates strategic technical vision.
- Successfully directed the development and deployment of commercial products on multiple Windows and Unix Platforms

**Chief Scientist**  Jan. 1995 – July 1999
**DynCorp Network Solutions**
*Fairfax, VA*

- Managed technical staff and deliverables for multiple large projects.
- Provided project design, development and troubleshooting guidance.
- Provided customer technical interface and problem resolution.
- Designed and deployed next generation architecture for high volume network database and storage systems.
- Created a suite of secure products marketed and sold to DoD and the Federal Government.
- Provided corporate-wide technical consultation and support.

**Senior Security Engineer**  Sept. 1990 – Jan. 1995
**Trusted Information Systems**
*Glenwood, Maryland*

- Participated in the design and implementation of the reference implementation of Privacy Enhanced Mail (PEM) with public and secret key encryption to provide security services for electronic transmissions.
- Designed NIST's Smartcard API (SCAPI).  Implemented the SCAPI for the NIST 250 and utilized it to perform cryptographic operations for PEM.
- Implemented X.500 Certification and Distinguished Naming support for PEM. Functions supported included:  CA and user registration, revocation, and high speed database for certificate storage and retrieval.
- Systems design and programming, including the TCB, for the Trusted Xenix and Trusted Mach MLS operating systems.  Tasks included MAC labeling and audit strategies, as well as application development.
- Designed and implemented multilevel electronic mail and HTTP proxy for Trusted Mach. Task included cryptographic support for the TCB as well as application specific validation and semantic checking for up/downgrade.
- Inventor of the Boot Integrity Token System (BITS), which provides hardware, enforced authentication within the boot sequence and guarantees operating system integrity.

**Technical Lead**  Nov 1989 – Sept 1990
**GTE Government Systems**
*Rockville, MD*

- Managed the SAFE91 testbed effort with responsibilities including: budgets, schedules, customer negotiations, briefings, training, and tasking of technical staff.  The testbed was created to simulate the client environment for the purpose of evaluating software packages and platforms for use by the client.
- Developed network load simulations for OS/2 LAN Manager to determine performance characteristics during periods of heavy traffic.  This task included the design and development of a multi-threaded connection server under OS/2 version 1.0
- Designed and implemented an X Windows interface for the Minstrel System.  This included the individual development of 20,000 lines of code in less than two months.
- Developed and taught DEC Windows and X Windows classes for GTE technical personnel.  Responsible for instruction and problem solving throughout the subsequent development cycle.

**Systems Engineer**  May 1985 – Nov. 1989
**Ultrasystems Defense and Space**

- Redesigned the Morse Mission Trainer while coordinating and tasking a team of programmers.  During this time, received the President's quarterly award for outstanding performance.  Task included systems and network and kernel level programming on SCO Xenix.
- Designed and implemented a database file server, benchmarked at over 100 retrievals per second on a million entry database.  System implemented B* trees in C and ran on a Sun 3/260 workstation.
- Designed and implemented a satellite mission scheduler for multiple vehicles with multiple resources.  Task included defining areas of interest (AOIs), flight paths, and optimal time allocation of resources.
- Designed and implemented the Ultraplot graphics tool to produce line and scatter plots, as well as bar graphs and histograms from large datafiles.  This utility was implemented utilizing the DI3000 (device independent) graphics package.

**HARDWARE**  Mainframe, Workstation, PC, including: IBM, DEC, Sun, HP, SGI, Intel

**SOFTWARE**  UNIX (Linux, System V, BSD, Solaris, AIX, IRIX, Xenix), MS DOS/Windows, VMS, OS/2, X Windows, DEC Windows, Presentation Manger, TCP/IP, X25, Xenix Net, IBM LAN, DEC Net, Ethernet, Token Ring

**EDUCATION**  **DSc. in Computer Science**
**Concentration in Security, Graphics, Intellectual Property Law**
*The George Washington University, 1994*

**M.S. in Electrical Engineering and Computer Science**
*University of Southern California, 1988*

**B.S. in Mathematics**
*University of California Irvine, 1986*

**Graduate level study in all major areas of computer science**

| | |
|---|---|
| **REPRESENTATIVE PUBLICATIONS** | "BITS – A Smartcard Protected Operating System," with Lance Hoffman, Communications of the ACM, November 1994. |
| | "Service Layering Promotes Secure Data Exchange in Diverse Environments," Computer News, October 23, 1995 |
| | "Threats Posed to Cryptographic Applications by Random Numbers," presented to the RSA Data Security Conference, January 1996. |
| | "A Reference Model for Electronic Commerce," with Daniel J. Blum and John Jauregui, Messaging Magazine, December 1996, Volume 2, Number 7. |
| | "Secure Compartmented Data Access over an Untrusted Network Using a COTS-based Architecture," with Marion C. Meissner, and Karen O. Vance, Presented to the Annual Computer Security Applications Conference (ACSAC'00), New Orleans, December, 2000. Later published in "Statistical Methods in Computer Security,"  Marcel Dekker, ISBN 0-8247-5939-7, edited by William W. S. Chen, 2005 |
| **ADDITIONAL INFORMATION** | (1) Dr. Clark was a member of the Federal Advisory Committee for Key Management Infrastructure (KMI); he was Chairman of the Interoperability Working Group for Cryptographic Key Recovery. |
| | (2) Dr. Clark served as a Cooperative Research and Development Agreements (CRADA) partner, which is a joint effort between the National Institute of Standards and Technology (NIST) and several companies formed to begin development of the elements of a Public Key Infrastructure (PKI).  A core element of this effort is the development of a Minimum Interoperability Specification for PKI components MISPC. |
| | (3) Dr. Clark serves as an adjunct professor in the Electrical Engineering and Computer Science Department at The George Washington University. He teaches doctoral level cryptography and computer security courses. |
| | (4) Speaker at The Federal Information Security Conference; presented "Embedded Security Deployment," Colorado Springs, CO, March 31, 2006 |
| | (5) Keynote Speaker for the Washington DC Bar Association; presented "Security for the Networked Computing Environment,"  August 8, 2005 |
| | (6) Appeared before Congressional committee to provide expert testimony; presented "Advanced Technology for Border Control," July 23, 1998. |
| | (7) Keynote speaker at Mass Storage Conference; presented "Secure Data Access Over Public Networks," New Orleans, LA, October, 1996 |
| | (8) Keynote speaker at health care convention, presented "Security for Health Care Records," Nashville, TN, May, 1997. |
| | (9) Keynote speaker at the USDA Plant and Genome Conference; presented "A Secure Architecture for Data and Systems," Nimes, France, October, 1997 |
| | (10) Speaker at IEEE Technical Meeting; presented "A Comprehensive Security Architecture," Virginia, June, 1996. |
| **RECENT CASES** | Testifying expert for TransPerfect v MotionPoint – Verdict for Transperfect |
| | Testifying expert for Cisco – VirNetX v Cisco – Verdict for Cisco |
| | Testifying expert for CME – RealTime v CME – Summary judgment for CME |
| | Testifying expert for IBM et al – Tecsec v IBM – Summary judgment for IBM |
| | Testifying expert for Netflix et al – Parallel Networks v Netflix – Case dismissed |
| | Testifying expert for Alcatel – Alcatel v Microsoft – Settled in favor of Alcatel |
| | Testifying expert for Oracle - EpicRealm v Oracle – Summary judgment for Oracle |
| | Testifying expert for Lucent - Microsoft v Lucent –Verdict for Lucent |
| | Testifying expert for Oracle - Mangosoft v Oracle – Summary judgment for Oracle |
| | Testifying expert for RSA Data Security – Digital Privacy v RSA – Summary judgment for RSA at the Markman |