UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN B. LONG, *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civil No. 1:14-cv-109 (AM) |
| v. ) | |
| ) | |
| IMMIGRATION AND CUSTOMS ) | |
| ENFORCEMENT, *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |

SUPPLEMENTAL DECLARATION OF JEFF WILSON
IN SUPPORT OF THE UNITED STATES DEPARTMENT OF HOMELAND
SECURITY'S MOTION FOR SUMMARY JUDGMENT

I.    INTRODUCTION

I, Jeff Wilson, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am the Unit Chief of the Information Technology Management Unit (the "ITM

Unit") within Enforcement and Removal Operations ("ERO") Law Enforcement and Systems

Analysis ("LESA") at U.S. Immigration and Customs Enforcement ("ICE"). I have held this

position (formerly known as the "Information Technology and Modernization Unit") since

August 2010. I served as the Acting Chief for the Modernization Unit from December 2008

until accepting the position. Prior to joining ICE in 2007 as a Management and Program

Analyst, I spent 16 years at the United States Treasury Department holding an array of positions

in the budget and information technology fields. The LESA ITM Unit mailing address is 500

12th Street, S.W., STOP 5009, Washington, D.C. 20536-5009.

1

2.      The LESA ITM Unit coordinates business side priorities and Information Technology ("IT") project agreements supporting ICE's objectives by developing new and modernizing existing technologies for ERO.

3.      As the Unit Chief for the ITM Unit, my official duties and responsibilities include the general management, oversight, and supervision of the ITM Unit and coordination with the ICE Office of the Chief Information Officer.  I manage and supervise a staff of ICE Information Technology Subject Matter Experts and Program Managers, who report to me regarding the advancement and progress of system updates and modernizations.

4.      I make this supplemental declaration in support of ICE's Motion for Summary Judgment in the above-captioned action.  The statements contained in this declaration are based upon my personal knowledge, my review of documents kept by ICE in the ordinary course of business, and information provided to me by other ICE employees in the course of my official duties.

5.      In my role as the Unit Chief for the ITM Unit, I am familiar with the following FOIA requests submitted by Susan Long and David Burnham on behalf of the Transactional Records Access Clearinghouse (TRAC) to ICE:

   a.   FOIA request dated October 13, 2010 asking for "a complete set of documentation on the 'Enforcement Integrated Database (EID).'"

   b.   FOIA request dated October 18, 2010 asking for "a complete set of documentation on the 'ICE Integrated Decision Support (IIDS) Database.'"

   c.  FOIA request dated September 21, 2012 asking for the "current 'snapshot' of ENFORCE prepared for ICE's Integrated Decision Support (IIDS) system."

   d.  FOIA request dated September 21, 2012 asking for records identifying any extracts and 'snapshots' prepared from the Enforcement Integrated Database (EID) over the last 12 months, along with records relating to the frequency with which such extracts and snapshots have been prepared, who was responsible for preparing any snapshot or extract, the recipient(s) of that extracts/snapshots, as well as the EID system time required in their preparation during this period.

   e.  FOIA request dated February 25, 2013 asking for the "current 'snapshot' of EID database prepared for CBP data warehouse."

   f.  FOIA request dated February 26, 2013 asking for the 1) the "current 'snapshot' of EID database prepared for EARM Data Mart" and the 2) "current 'snapshot' of EID database prepared for EID Data Mart."

6.     I have reviewed the Declaration of Susan B. Long and the accompanying Exhibits G-M; the Declaration of Paul C. Clark, D.Sc.; and the Declaration of Michael Hassan. This declaration supplements my previous declaration, dated October 2, 2014.

**PLAINTIFFS ASSERT THAT ICE HAS PREVIOUSLY PROVIDED EID DATABASE SCHEMA, THE NAMES OF NUMEROUS TABLES AND DATA FIELDS, AND THE DATABASE SOFTWARE AND VERSION NUMBER OF THE SOFTWARE FOR IIDS**

7.      Plaintiffs provided four (4) pages (Exhibits G-J) which they indicate were provided to them1) at the administrative level in response to a prior FOIA request to ICE that is not the subject of this litigation; 2) at the administrative level in response to the October 18, 2010 FOIA request seeking a complete set of documentation on the ICE Integrated Decision Support (IIDS) Database; and 3) during the course of an unidentified litigation. Plaintiffs assert that this release of 4 pages of documentation supports their position that the technical documentation pertaining to the EID and IIDS databases is not law enforcement sensitive and will not cause harm to the agency upon release. LESA, the ICE program office with equities in this type of information, did not approve the release of the pages marked as Exhibits G-I and any additional release of technical documentation will increase the risk of a database compromise. I am unable to address the release of Exhibit J as plaintiffs do not provide the specific litigation or circumstances surrounding the release.

8.      Paragraph 15 of the Declaration of Michael Hasan asserts that the withholding of the names of database tables and fields is "tantamount to withholding the data itself." However, previous responses to TRAC requests have described the type of data without divulging technical information about the database such as specific field names and column/row names. ICE has accommodated those requests without providing the exact row and column names or the technical parameters by which ICE organizes its data. In lieu thereof, ICE has provided the Plaintiffs with descriptive terms for the fields of information (i.e. date of original entry, country of citizenship, and sentence for most serious criminal conviction) so that the data provided is understandable to the requester but database security is not compromised.

4

## SECURITY OF RECORDS AND PREVENTATIVE MEASURES AS REQUIRED
## BY THE FEDERAL INFORMATION SECURITY MANAGEMENT ACT OF 2002

9.     ICE has multiple layers of data security where one layer protects the next. Firewalls have been established as preventative measures against harmful actions or attacks that will disrupt operations. Regardless, there are still dangers associated with providing information and records associated with system development, data tables and fields, outage times, etc. whether or not the database has a "publically accessible web interface." The 2014 information security breach at Home Depot provides a clear example of the need for data security protections beyond firewalls.  This breach was initiated by the insertion of malicious software — malware — into point-of-sale machines at stores in the USA and Canada.  The lack of a web interface did not prevent or lessen the impact.

10.     The fundamental goal of any information assurance program is to protect information and information systems from unauthorized access, use, disclosure, disruption, modification, or destruction.  A single piece of information at face value may be deemed harmless but must be evaluated holistically in order to ensure that system integrity, system availability, and system confidentiality are maintained.  Intimate knowledge of tables, codes, and schemas can be used to create a more sophisticated attack that lasts days, weeks or even months. Additional technical dangers include: cross site scripting, session hijacking, SQL injection, race conditions, unformatted error messages, improper html rendering and submittals, among others. The inconspicuous nature of a breach due to malware is the most harmful aspect. The severity of the Home Depot breach was due to the fact that it went unnoticed for five months.

11. The Federal Information Security Management Act of 2002 (FISMA) requires ICE to develop an agency-wide information security program to protect sensitive system information. In support of FISMA, and, as part of the ICE Information Security Program, ICE applies Least Privileges as described by the National Institute of Standards and Technology Special Publication 800-53 (NIST SP 800-53), "[a]llowing only authorized accesses for users (or processes acting on behalf of users) which are necessary to accomplish assigned tasks in accordance with organizational missions and business functions." [1] The NIST SP 800-53 Least Privilege Control Enhancements and Supplemental Guidance states "[s]ecurity-relevant information includes, for example, filtering rules for routers/firewalls, cryptographic key management information, configuration parameters for security services, and access control lists."[2] Only those individuals with a need-to-know are allowed access to configuration files, firewalls, and database schemas due to the sensitive nature that this type of system information provides. Individuals with access to these items have also undergone ICE's background screening and investigation process. Release of sensitive system information such as configuration files and database schemas increase the likelihood of fraud and pose cyber security risks to ICE networks. Additionally, DHS 4300A Information Security Policy, with which ICE must abide, defines sensitive information as "information not otherwise categorized by statute or regulation that if disclosed could have an adverse impact on the welfare or privacy of individuals or on the welfare or conduct of Federal programs or other programs or operations essential to the national interest."[3]

---

[1] See page F-18 in http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r4.pdf.
[2] See page F-12 in http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r4.pdf.
[3] See DHS Sensitive Systems Policy Directive 4300A, Version 8, page 3 at http://www.dhs.gov/xlibrary/assets/foia/mgmt_directive_4300a_policy_v8.pdf.

6

## PLAINTIFFS ASSERT THAT ICE HAS PREVIOUSLY PROVIDED
## "EXTRACTS OF DATA FROM THE IIDS DATABASE"

12.   Presently and in the past the ICE, Enforcement and Removal Operations Unit, Law Enforcement and Systems Analysis Unit (LESA), in response to detailed requests by TRAC, has created queries to run in an applicable datamart in order to pull the specified data elements requested by the  individuals. In addition, LESA has in the past compiled anonymized spreadsheets containing the information sought. For example, in a February 3, 2014 request submitted by Susan B. Long and David Burnham on behalf of the Transactional Records Access Clearinghouse, TRAC requested "anonymous case-by-case information on each removal and return for January 2014." The request specifically asked for 54 data elements for each individual removed/returned; the data elements include, inter alia, biographical information, criminal history, and immigration history for every individual removed/returned for a limited period of time, January 1-31, 2014. See Exhibit 29.  The Agency was able to provide this information without releasing personally identifiable information or database information capable of compromising the system in the manner requested in the instant case.

As the spreadsheet reflects (Plaintiffs' Exhibit K), the agency is willing to release responsive information that is not subject to a specific FOIA exemption as long as that information does not require the agency to release personally identifiable information and it does not require the release of information capable of compromising its databases such as column or data type names in the spreadsheet. As with all reports, LESA converts specific column and data type names into plain language to facilitate understanding of the data. This process ensures that the nature of the data (i.e. country of citizenship) is identified for the requester but the agency's database infrastructure is protected from disclosure. This course of action was decided upon by

7

the ICE FOIA Office and ICE Enforcement and Removal Operations, Law Enforcement and Systems Analysis unit, and was not required. ICE weighed all delivery options and ultimately found it more efficient to generate a new record for the particular subset(s) of data requested by TRAC's than to provide all of the paper records in support of the data.

13. The above-referenced TRAC requests are vastly different from the following FOIA requests, which are the subject of the present litigation:

- a. FOIA request dated September 21, 2012 asked for the "current 'snapshot' of ENFORCE prepared for ICE's Integrated Decision Support (IIDS) system."

- b. FOIA request dated September 21, 2012 asked for records identifying any extracts and 'snapshots' prepared from the Enforcement Integrated Database (EID) over the last 12 months, along with records relating to the frequency with which such extracts and snapshots have been prepared, who was responsible for preparing any snapshot or extract, the recipient(s) of that extracts/snapshots, as well as the EID system time required in their preparation during this period.

- c. FOIA request dated February 25, 2013 asking for the "current 'snapshot' of EID database prepared for CBP data warehouse."

- d. FOIA request dated February 26, 2013 asking for the 1) the "current 'snapshot' of EID database prepared for EARM Data Mart" and the 2) "current 'snapshot' of EID database prepared for EID Data Mart."

These requests seek "current 'snapshots/extracts'" from the Enforcement Integrated

Database (EID) which are replicated into various datamarts including the ICE Integrated

Decision Support System (IIDS). The agency's manner of responding to requests such as

those represented in Exhibit 29 is wholly inadequate for responding to a request for all

data replicated at unspecified points in time into other datamarts for the facilitation of

agency reporting. The volume of the information requested is different and far greater

than the previous requests referenced by Plaintiffs in their Brief in Opposition to the

Defendant's Motion for Summary Judgment as explained in my initial Declaration.

Furthermore, the replication or copying of all data from EID data into the IIDS, and other

datamarts is not a pull of data as was done in Exhibit 29, discussed above.


## THE PROCESS FOR CREATING AN EXTRACTS/SNAPSHOTS BY A FEDERAL AGENCY DIFFERS FROM THE PROCESS FOR THE PRIVATE SECTOR


     14.    Paragraph 10 of the Declaration of Michael Hasan explains that extraction is a built

in function of any commercially available database management system and therefore it is an

easy and inexpensive process to extract data. This, however, is an oversimplification of the

difficult process that ICE must undertake, which requires multiple experts to ensure that the

process is done correctly. Specifically, the federal government must follow the NIST and DHS

security policies and procedures which requires that all staff (including, but not limited to

technical, functional, and operational staff) apply this guidance to all aspects of IT management

(including, but not limited to  tracking software, annual reporting and reviews, design

documentation, configuration data, code and information, configuration control boards and

meetings, report documentation, and approvals on project plans, updates, and policy and procedure).

15.    In order to create a "snapshot of data that are extracted from the EID and transferred to several associated databases on a regular basis," ICE would need to develop a new process and create a new record.  Currently, there is no specific product, report or snapshot generated during the Extract-Transform-Load (ETL) process where information from the EID is transferred to IIDS and the datamarts. As mentioned in the October 2, 2014 declaration, this process is automatic and occurs through a link established between two databases with no tangible extract files. Generating and then redacting these extract files would be quite burdensome and costly to ICE as explained in my previous Declaration.

16. In addition to the difficult process involved in copying the data that was replicated into one of the datamarts, the data must be reviewed and redacted by the employees in the ICE FOIA Office and not the employees of ERO LESA. At this particular time, the ICE FOIA Office does not have the existing technology or expertise for processing this data. The redaction process for this request is expensive for a federal agency. It requires a modification to an existing contract, clearances, background screenings, training, and ramp up time.

## ICE'S SEARCH FOR TECHNICAL DOCUMENTATION WAS ADEQUATE

17. As discussed in Section III of the October 2, 2014 declaration, ICE conducted a comprehensive search of all documentation as the System Lifecycle Management (SLM) repository is the official place for these documents and records (e.g., database design records and schemas). ICE did not search for technical documentation in the EID database because TRAC

10

requested documents that are analogous of "blueprints" which would be found in the SLM repository. The request did not include searching the EID database for these records and designs. Performing those activities are analogous to walking around an office building to deduce and re-create the office building blueprints, which in this particular situation, would be creating a new, duplicative record which is not required under FOIA.

**JURAT CLAUSE**

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.  Signed this  12th  day of January 2015.

Jeff Wilson
Unit Chief, Information Technology Management
Unit
Law Enforcement and Systems Analysis
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street, S.W., Stop 5009
Washington, DC 20536-5009