# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SUSAN B. LONG and<br>DAVID BURNHAM,<br><br>Plaintiffs,<br><br>v.<br><br>IMMIGRATION AND CUSTOMS<br>ENFORCEMENT and CUSTOMS<br>AND BORDER PROTECTION<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:14-cv-109 (APM) |

### SECOND DECLARATION OF PAUL C. CLARK, D.Sc.

I, Paul C. Clark, D.Sc., declare as follows:

1. My original declaration in this case, executed on November 13, 2014, describes who I am and my background and qualifications in the area of data security. I hearby incorporate that declaration by reference.

2. I have reviewed, in addition to the materials described in my original declaration, the supplemental declarations submitted in this case by Fernando Pineiro and Jeff Wilson, executed on January 28, 2015, and January 12, 2015, respectively.

3. In paragraph 12 of my original declaration, I explained that because there is no externally accessible web interface with the databases at issue in this case, disclosure of information about the structure of the databases could pose no credible threat of a SQL injection attack. Mr. Wilson's supplemental declaration does not

contest that there is no accessible interface with the databases, but states: "The 2014 information security breach at Home Depot provides a clear example of the need for data security protections beyond firewalls. This breach was initiated by the insertion of malicious software—malware—into point-of-sale machines at stores in the USA and Canada. The lack of a web interface did not prevent or lessen the impact."

4. Mr. Wilson's statement supports the point that a means of access by an outsider is essential to the insertion of malicious software. In the Home Depot example he cites, access was obtained not through a web interface, but through point-of-sale devices that connected to Home Depot's system. ICE obviously does not use point-of-sale devices that would provide an attacker with access to its systems, and Mr. Wilson does not suggest that any comparable means of access to ICE's systems exists.

5. My original declaration also stated, in paragraphs 13 and 15, that best practices for data security involve the use of protective measures such as command validation, firewalls, strong authentication, session and account lockouts, limits on user access including least privilege, and network security monitoring; such best practices do not include obscurity or secrecy of details about a computer application such as the structure of databases residing on a system.

6. The supplemental Pineiro and Wilson declarations confirm that ICE employs strong protective measures for its data, consistent with those best practices. They do not contest my explanation of accepted best practices among security professionals. Mr. Wilson, in paragraph 11 of his supplemental declaration,

recognizes that National Institute of Standards and Technology (NIST) recommendations reflect best practices for government information security, but does not address NIST's position that "[s]ystem security should not depend on the secrecy of the implementation or its components." Karen Scarfone, Wayne Jansen, & Miles Tracy, *Guide to General Server Security: Recommendations of the National Institute of Standards and Technology*, Special Pub. 800-123, at 2-4 (July 2008).

7. Mr. Wilson, in paragraph 11 of his supplemental declaration, cites NIST's identification of information about firewall filtering rules, cryptographic keys, security service configuration parameters, and access control lists as "security-relevant information." There is no question that revealing information that would actually allow an attacker to bypass firewalls, password protections, and other controls on access would be inconsistent with information security practices. But disclosing information about the *structure of a database* does not reveal such "security-relevant information" or enable an attacker to penetrate the barriers that prevent access to the system, and the material Mr. Wilson quotes from NIST does not suggest otherwise.

8. Mr. Pineiro states, in paragraph 11 of his supplemental declaration, that revealing the information sought in this case would "allow[] persons versed in computer mainframes and systems to obtain unauthorized access." Mr. Pineiro does not state that he has any qualifications as an expert in computer or data security, and his statement is cursory and without basis. Knowing the fields and data types a database contains no more facilitates unauthorized access—which requires bypassing

the firewalls and other protections that prevent access to the system—than knowing what is inside a house enables an intruder to get through a locked door.

9. Both Mr. Wilson and Mr. Pineiro assert that if an attacker were able to obtain a means of access to ICE's systems (notwithstanding the absence of any means of external access) and to bypass ICE's security (notwithstanding the firewalls, password protections and other measure used by ICE), knowledge of the structure of its databases would facilitate insertion of malware. However, an attacker who was able to penetrate ICE's security to obtain access to the database would also obtain access to the database schema and the names of database tables and fields as well as the underlying data. Moreover, the injection of malware does not require advance knowledge of the details of database structures. Thus, if ICE's security is actually vulnerable to an attack, concealing the structure of its databases is highly unlikely to provide any effective protection against the insertion of malicious software.

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct.

Executed in Bethesda, Maryland on March 26, 2014.

Paul C. Clark