## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN B. LONG, *et al.* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 1:14-CV-00109-APM |
| | ) |
| | ) |
| U.S. IMMIGRATION AND | ) |
| CUSTOMS ENFORCEMENT, *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## SUPPLEMENTAL DECLARATION OF JEFF WILSON
## IN SUPPORT OF THE UNITED STATES DEPARTMENT OF HOMELAND
## SECURITY'S MOTION FOR SUMMARY JUDGMENT

**I.   INTRODUCTION**

I, Jeff Wilson, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am the Unit Chief of the Information Technology Management Unit (the "ITM Unit")

within Enforcement and Removal Operations ("ERO") Law Enforcement and Systems Analysis

("LESA") at U.S. Immigration and Customs Enforcement ("ICE"). I have held this position (formerly

known as the "Information Technology and Modernization Unit") since August 2010. I served as the

Acting Chief for the Modernization Unit from December 2008 until accepting the position. Prior to

joining ICE in 2007 as a Management and Program Analyst, I spent 16 years at the United States

Treasury Department holding an array of positions in the budget and information technology fields. The

LESA ITM Unit mailing address is 500 12th Street, S.W., STOP 5009, Washington, D.C. 20536-5009.

2.      The LESA ITM Unit coordinates business side priorities and Information Technology ("IT") projects supporting ICE's objectives by developing new and modernizing existing technologies for ERO.

3.      As the Unit Chief for the ITM Unit, my official duties and responsibilities include the general management, oversight, and supervision of the ITM Unit and coordination with the ICE Office of the Chief Information Officer.  I manage and supervise a staff of ICE Information Technology Subject Matter Experts and Program Managers, who report to me regarding the advancement and progress of system updates and modernizations.

4.      I make this supplemental declaration in response to the Court's December 14, 2015 ruling, which permits the submission of additional information regarding the adequacy of the Agency's search undertaken in response to FOIA Request III (records identifying any extracts and 'snapshots' prepared from the Enforcement Integrated Database (EID) over the last 12 months, along with records relating to the frequency with which such extracts and snapshots have been prepared, who was responsible for preparing any snapshot or extract, the recipient of the extracts/snapshots, as well as the EID system time required in their preparation during this time). Doc. 17-3, Exhibit 14.  The statements contained in this declaration are based upon my personal knowledge, my review of documents kept by ICE in the ordinary course of business, the Court's order dated December 14, 2015, and information provided to me by other ICE employees in the course of my official duties.

## II.    AGENCY'S RESPONSE TO FOIA REQUEST III AT THE ADMINISTRATIVE LEVEL

5.      Paragraph 17 of the *Supplemental Declaration of Fernando Pineiro in Support of the United States Department of Homeland Security's Motion for Summary Judgment*, dated January 13, 2016 states that a search conducted by OCIO for records responsive to FOIA Request III "resulted in nine (9) pages, which were provided to the ICE FOIA Office. The nine (9) pages were subsequently

processed and released to the Plaintiffs. The records were accompanied by a final response letter dated

January 25, 2013, which informed Plaintiffs that ICE withheld portions of these record pursuant to

Exemptions (b)(6), (b)(7)(C), and (b)(7)(E) of the FOIA."

6.      I am familiar with the nine (9) pages released at the administrative level and note that the

nine (9) pages that were released were entitled "EARM Interfaces Summary for FOIA Request." This

document was created in an effort to respond to plaintiffs' FOIA Request III, and not a document that is

kept or maintained by ICE in its normal course of business. Therefore, it is not located within the

system lifecycle management (SLM) repository where the other responsive documents reside.

7.      Further, regarding specific names of points of contact for those who monitor the

automated processes of preparing the extracts and those monitoring the automated process of receipt of

the extracts, those names were requested from and provided by ICE employees using their institutional

knowledge of ICE in an effort to provide a response to e the FOIA Request III. These names are not

contained within any technical documentation and are not captured by the Agency on a routine basis.

8.      Lastly, with regard to the EID system time required in the preparation of extracts or

'snapshots,' the Agency does not capture the amount of EID system time required for the preparation of

extracts. The Agency does capture "start times" (the time that the extract preparation is started as these

times are set and consistent), however, as discussed in further detail below in paragraph 41, because

extract preparation times vary depending on the volume of data being copied, the Agency does not

capture "stop times" (the times that the extract preparation ends). The Agency only maintains a record

of fixed start times for extract preparations in the technical documentation. Because the Agency does not

capture "stop times," the times provided in the document released at the administrative level were

requested of and provided by a knowledgeable subject matter expert or otherwise extrapolated from

system audit logs.

**III.    SEARCH FOR FOIA REQUEST III DURING LITIGATION IS ENCOMPASSED BY THE SEARCHES DONE FOR FOIA REQUEST I AND II.**

9.      The Plaintiffs have requested multiple similar and overlapping requests. For example, in FOIA Requests I and II, the Plaintiffs have requested design documents, such as the metadata, database schema, and technical documentation for the Enforcement Integrated Database (EID) and the ICE Integrated Decision Support (IIDS) systems, Doc. 17-3, Exhibits 1 and 8, respectively.

10.      Additionally, plaintiffs requested in FOIA Request III "records identifying any extracts and 'snapshots' prepared from the Enforcement Integrated Database (EID) over the last 12 months, along with records relating to the frequency with which such extracts and snapshots have been prepared, who was responsible for preparing any snapshot or extract, the recipient(s) of that extract/snapshots, as well as the EID system time required in their preparation during this period."

11.      Information or documents responsive to FOIA Request III would be contained within the records sought in FOIA Request I and II, with the exception of specific names of points of contact receiving the extract, which the agency would withhold pursuant to FOIA exemptions b(6), b(7)(C) as personally identifiable information.   For example, information or records regarding "extracts and 'snapshots'" would be contained within the technical documentation for EID and IIDS. Additionally, frequency, and duration of the extracts would also be contained within the technical documentation requested in FOIA Requests I and II.

12.      During the pendency of this litigation, in response to FOIA Requests I and II, the SLM repository was reviewed in its entirety for responsive documentation. ICE subsequently prepared a categorical Supplemental *Vaughn* Index (Doc. 17-4 filed October 9, 2014) and an Amended Detailed Description Table (Doc. 25-4 filed January 28, 2015) of all documents contained in the entire SLM repository. The Supplemental *Vaughn* Index and the Amended Detailed Description Table contained

4

detailed descriptions of the categories of records contained in the SLM and a detailed explanation of the withholdings that would be applicable. The Supplemental *Vaughn* Index was prepared to fully explain the reasoning behind the Agency's inability to provide the information requested as well as to outline the complete and thorough search of the SLM repository.

13.     Because all of the information requested in FOIA Request III is either located in the same SLM repository as the documentation requested in FOIA Requests I and II, and in many cases overlaps with that documentation directly, or is not captured and documented in any documentation, such as the names of employees responsible for  monitoring the automated processes involved with preparing an extract, the names of persons responsible for monitoring the automated processes involved with receiving an extract, and the system time required for preparation of the extracts. This would make further searching for documentation in response to FOIA Request III duplicative. Moreover, the documents described within the Supplemental *Vaughn* Index (Doc. 17-4 filed October 9, 2014) and the Amended Detailed Description Table (Doc. 25-4 filed January 28, 2015) are documents responsive not only to FOIA Requests I and II, but also to FOIA Request III. A description of all of the categories of information located in the SLM repository, including documents responsive to FOIA Request III, and the applicable FOIA exemptions are set forth in the Supplemental *Vaughn* Index (Doc. 17-4 filed October 9, 2014) and the Amended Detailed Description Table (Doc. 25-4 filed January 28, 2015).

IV.     **FOIA REQUEST III RECORDS OVERLAP WITH FOIA REQUEST I AND II AND ARE DETAILED IN THE SUPPLEMENTAL VAUGHN INDEX.**

14.     A description of the specific document categories as outlined in Supplemental *Vaughn* Index (Doc. 17-4 filed October 9, 2014) and the Amended Detailed Description Table (Doc. 25-4 filed January 28, 2015) associated with each element of FOIA Request III is set forth below. Additionally, the specific sensitivity of each element of FOIA Request III is described in detail below to supplement and highlight the reasoning behind the Agency's inability to provide the information requested.

A. **FOIA Request III – "Copy of records identifying any extracts and 'snapshots' prepared**
**from the EID over the last 12 months"**

15.     Records "identifying any extracts and 'snapshots' prepared from EID over the last 12
months" overlap directly with records requested in FOIA Request I and II and would be located entirely
within the SLM repository.  These records are found in the following categories on the Supplemental
*Vaughn* Index (Doc. 17-4 filed October 9, 2014) and an Amended Detailed Description Table (Doc. 25-
4 filed January 28, 2015): Interface Control Agreement (ICA); Interface Control Document (ICD),
System Requirements Document (SRD), Interface Design Document (IDD), and Interface Test Plan.

16.     Each system lifecycle document must stand on its own; therefore, information may be
repeated in various documents for contextual purposes thus records identifying any extracts and
snapshots may also be found in the following document categories:  Version Description Document
(VDD), Notice of Intent to Release (NIR), Data Management Plan (DMP), Production Readiness
Review (PRR), Implementation Plan, Development Test Analysis Report (DTAR), Integration
Readiness Review (IRR), Request for Deviation (RFD), Production Readiness Review (PRR)
Development Test Plan (DTP), Data Schema, Test Readiness Review (TRR) Approval Certification,
Release Readiness Review (RRR) Approval Certification, Risk Assessment (Word/PDF), Production
Readiness Review (PRR) Summary, Test Readiness Review (TRR) Summary, Contingency Plan,
Project Schedule, Independent Test Analysis Summary, Independent System Test Plan, Requirements
Traceability Matrix (RTM), Release Readiness Review (RRR) Summary, Configuration Management
(CM) Plan Graphics, Risk Assessment, Project Tailoring Plan (PTP), Project Management Plan (PMP),
Test Installation Review (TIR), Security Test and Evaluation (ST&E) Plan, Fact Sheet, System Security
Plan (SSP), Operations Manual, Training Plan, Design Document (DD), Test Readiness Review (TRR),
(TRR) Approval Letter (AL), Migration Plan, DHS ICCB e-mail from ICE OCIO, Test Installation

6

Review (TIR) Summary, Configuration Management (CM) Plan, Maintenance Release Notice, Production Tasks Work Instructions, Sensitive System Security Plan (SSSP), Functional Requirements Document (FRD), Independent System Test Analysis Summary, Design Document (DD) Schema, Test Coverage Matrix (TCM), Test Installation Review (TIR) Completion Letter, Interfaces and Integration Transition Inventory, Interfaces and Integration Transition Inventory Project Schedule, Data Dictionary, Promotion Implementation Plan, Planning Review Summary, Planning Review Approval Certification, Requirements Review Summary, Requirements Review Approval Certification, Preliminary Architecture and Design Review (PADR) Summary, Preliminary Architecture and Design Review (PADR) Approval Certification, User Manual, Data Migration Plan, Design Review Presentation, System Workload Analysis Document (SWAD), Preliminary Architecture and Design Review (PADR) PowerPoint, Data Mapping Document, and the Technical Design Document (TDD).  These records include information describing access to EID and sensitive database technical documentation regarding EID.

17.     In addressing the sensitivity of the records or information responsive to this portion of FOIA Request III, the *Declaration of J. Thomas Foster's in Support of the United States Department of Homeland Security's Motion for Summary Judgment*, dated January 14, 2016, specifically outlines the dangers in providing all of the requested elements which could potentially lead to a breach in the ICE systems. Paragraph 9 of the declaration states, "Providing information about the database tables, structure, and metadata itself can point individuals with malicious intent directly to the targeted information thereby undermining the "defense in depth" approach and increasing the likelihood that agency systems may be compromised. No single security measure can adequately protect a network or a system; there are simply too many methods available to an attacker for this to be successful." The more

7

system information that ICE releases to the public, the more susceptible the agency is to an attack, which can subsequently prevent ICE from carrying out the Agency's mission.

18.     An attacker with knowledge that information from one or more information systems is periodically transmitted to another information system (i.e. documentation describing how and when the extract taken from EID is transmitted to IIDS or any other repository) can then monitor a network for this activity. Monitoring this activity could permit an intruder to learn the layout of the network and location of key systems enabling a subsequent specifically targeted attack.  This is analogous in the physical world to covertly surveilling armored truck shipments from one bank to another, to learn their routes and destination addresses to better plan a heist.

19.     Keeping with the same analogy, if you viewed the EID as a large bank with numerous branches, it would require many interfaces to effectively manage operations.  Without these interfaces, nothing would prevent customers from withdrawing all of their funds from a branch then visiting another location to conduct the very same transaction.  The EID operates in a similar manner by ensuring actions taken by one component of DHS are visible to all other components.  Additionally, banks have external interfaces which allow its customers to conduct transactions at automated transaction machines (ATMs) that belong to other institutions. This is not only convenient for its customer base but provides an immeasurable cost savings in terms of time and money. The EID external interfaces provide a similar service to stakeholders outside of DHS. For example, EID shares detention data with the Department of Justice which allows court cases to be prioritized by length of stay and location. This increases appearance rates and saves the government millions of dollars in detention costs.

20.     The information describing the access of EID and interplay between the EID and other systems or repositories, which would include extracts and snapshots taken from EID over the last 12 months, should be strictly managed and restricted, as reinforced in paragraph 12 of the *Declaration of J.*

8

*Thomas Foster's in Support of the United States Department of Homeland Security's Motion for Summary Judgment*, dated January 14, 2016: "Restriction to access is part of the layered approached to security, and the disclosure of sensitive database technical documentation pertaining to EID and IIDS increases the risk of an unauthorized person gaining access to a privileged account and restricted data."

21.     Accordingly, the Agency would apply Exemption (b)(7)(E) of the Freedom of Information Act (FOIA), 552 U.S.C. § 552 to protect from disclosure information compiled for law enforcement purposes, the release of which would disclose law enforcement guidelines, such as information describing how two systems interface, technical details, specific data element exchanged between the systems, as well as hardware and software specifications, which are not well known to the public and, if disclosed, could reasonably be expected to risk circumvention of the law. Disclosure of the information could allow someone to understand the design and functionality of the system and therefore undermine it by exploiting a revealed vulnerability.

B.  **FOIA Request III –"[R]ecords relating to the frequency with which such extracts and snapshots have been prepared"**

22.     Records "relating to the frequency with which such extracts and snapshots have been prepared" include information regarding the extracts themselves as detailed above and overlap with FOIA Request I and II in that the records containing information about frequency of the extracts would be included in detailed technical plans and documentation found in the following categories on the Supplemental *Vaughn* Index (Doc. 17-4 filed October 9, 2014) and an Amended Detailed Description Table (Doc. 25-4 filed January 28, 2015): Interface Control Agreement (ICA); Interface Control Document (ICD), System Requirements Document (SRD), Interface Design Document (IDD), and Interface Test Plan, all withheld pursuant to Exemption (b)(7)(E) of the FOIA.

23.     Each system lifecycle document must stand on its own; therefore, information may be repeated in various documents for contextual purposes thus records identifying any extracts and snapshots may also be found in the following document categories:  Version Description Document (VDD), Notice of Intent to Release (NIR), Data Management Plan (DMP), Production Readiness Review (PRR), Implementation Plan, Development Test Analysis Report (DTAR), Integration Readiness Review (IRR), Request for Deviation (RFD), Production Readiness Review (PRR) Development Test Plan (DTP), Data Schema, Test Readiness Review (TRR) Approval Certification, Release Readiness Review (RRR) Approval Certification, Risk Assessment (Word/PDF), Production Readiness Review (PRR) Summary, Test Readiness Review (TRR) Summary, Contingency Plan, Project Schedule, Independent Test Analysis Summary, Independent System Test Plan, Requirements Traceability Matrix (RTM), Release Readiness Review (RRR) Summary, Configuration Management (CM) Plan Graphics, Risk Assessment, Project Tailoring Plan (PTP), Project Management Plan (PMP), Test Installation Review (TIR), Security Test and Evaluation (ST&E) Plan, Fact Sheet, System Security Plan (SSP), Operations Manual, Training Plan, Design Document (DD), Test Readiness Review (TRR), (TRR) Approval Letter (AL), Migration Plan, DHS ICCB e-mail from ICE OCIO, Test Installation Review (TIR) Summary, Configuration Management (CM) Plan, Maintenance Release Notice, Production Tasks Work Instructions, Sensitive System Security Plan (SSSP), Functional Requirements Document (FRD), Independent System Test Analysis Summary, Design Document (DD) Schema, Test Coverage Matrix (TCM), Test Installation Review (TIR) Completion Letter, Interfaces and Integration Transition Inventory, Interfaces and Integration Transition Inventory Project Schedule, Data Dictionary, Promotion Implementation Plan, Planning Review Summary, Planning Review Approval Certification, Requirements Review Summary, Requirements Review Approval Certification, Preliminary Architecture and Design Review (PADR) Summary, Preliminary Architecture and Design Review

(PADR) Approval Certification, User Manual, Data Migration Plan, Design Review Presentation, System Workload Analysis Document (SWAD), Preliminary Architecture and Design Review (PADR) PowerPoint, Data Mapping Document, and the Technical Design Document (TDD).

24.     Regarding the sensitivity of the records or information responsive to the above portion of FOIA Request III, *Declaration of J. Thomas Foster's in Support of the United States Department of Homeland Security's Motion for Summary Judgment*, dated January 14, 2016. states specifically regarding details of a technical system not known by the public: "Detailed knowledge of technical system aspects not known by the public including operating system versions, database schema, and interfaces in conjunction with publically available Privacy Act compliance documents (Systems of Records Notices and Privacy Impact Assessments1), can reduce the time and effort required for an attacker to penetrate, infiltrate, and exploit key systems, and retrieve and exfiltrate target data before being detected."

25.     Consequently, the Agency would apply Exemption (b)(7)(E) of the FOIA to protect from disclosure information compiled for law enforcement purposes, the release of which would disclose law enforcement guidelines, such as the frequency with which extracts are prepared, which are not well known to the public and, if disclosed, could reasonably be expected to risk circumvention of the law.

---

[1] http://www.dhs.gov/sites/default/files/publications/privacy-piaupdate-eid-september2015_0.pdf
- DHS/ICE/PIA-015 (f) Enforcement Integrated Database, April 8, 2014, PDF 10 pages, 233 KB.
- DHS/ICE/PIA-015 (e) Enforcement Integrated Database ENFORCE - EAGLE Update, July 25, 2012.
- DHS/ICE/PIA-015(d) Enforcement Integrated Database (EID) ENFORCE Alien Removal Module Update, April 6, 2012
- DHS/ICE/PIA-015(c) Enforcement Integrated Database (EID) ENFORCE Alien Removal Module Update, November 7, 2011
- DHS/ICE/PIA-015(b) Enforcement Integrated Database (EID), May 20, 2011
- DHS/ICE/PIA-020(a) Alien Criminal Response Information Management System (ACRIMe) & Enforcement Integrated Database (EID) Update, September 29, 2010
- DHS/ICE/PIA-015 Enforcement Integrated Database (EID) January 14, 2010 (PDF, 29 pages – 420.65 KB)

- DHS/ICE-011 - Immigration Enforcement Operational Records System (ENFORCE)

Disclosure of the information could allow someone to understand the design and functionality of the system and therefore undermine it by exploiting a revealed vulnerability.

26.     Having access to the detailed technical plans which divulge the frequency or timeline of events adds yet another layer of information that could allow a perpetrator to recreate a similar system which could be utilized as a model in an attack against ICE systems. In other words, if an attacker knows that an extract occurs each day rather than monthly, it can shorten the time an attacker needs to surveil a network, providing both a shorter time to learn more about the network while also leaving less time to be discovered. In addition, it gives an attacker ability to tailor attacks so that they go unnoticed. For instance by modifying information just before an interface starts and changing it back immediately upon completion would cause erroneous data to be sent to stakeholders, and possible never corrected because the integrity of data obtained directly from a system of record is seldom challenged.

27.     Accordingly, the detailed technical plans that contain the information regarding frequency of extracts as requested in FOIA Request III are considered law enforcement sensitive pursuant to FOI A exemption b(7)(E) as detailed in the Supplemental *Vaughn* Index (Doc. 17-4 filed October 9, 2014) and an Amended Detailed Description Table (Doc. 25-4 filed January 28, 2015).

   C. **FOIA Request III –"[W]ho was responsible for preparing any snapshot or extract"**

28.     Records containing the responsible parties for preparing snapshots or extracts from EID would include information which overlaps with FOIA Requests I and II in that the information about this automated process responsible for preparing any snapshot or extract would be included in technical documentation found in the following categories on the Supplemental *Vaughn* Index (Doc. 17-4 filed October 9, 2014) and an Amended Detailed Description Table (Doc. 25-4 filed January 28, 2015): Interface Control Agreement (ICA), Interface Control Document (ICD), System Requirements Document (SRD), Interface Design Document (IDD), and Interface Test Plan.

29.     Regarding sensitivity of the records or information responsive to the above portion of

FOIA Request III, as mentioned in Sections II and VI of the *Declaration of Jeff Wilson in Support of the*

*United States Department of Homeland Security's Motion for Summary Judgment,* dated October 2,

2014 (Document 17-6 filed October 9, 2014), the process for preparing extracts or snapshots is

automated and occurs through a link established between two databases with no tangible extract files.

30.     Nevertheless, there is always a person, or persons, who, as part of their job description,

are responsible for monitoring the successful execution of that automated process. As job duties and

responsibilities, as well as personnel, shift constantly, there is no single document that outlines a specific

person responsible for monitoring this automated process at all times.  Further, ICE would assert FOIA

exemptions b(6), b(7)(C) to protect from disclosure information pertaining to third parties who have not

provided consent. Without the explicit consent of the individual(s) named in the records sought, ICE

may not release the records compiled for law enforcement purposes to the public. Protecting the privacy

interests of individuals who may be named in ICE records, which are the target of FOIA requests,

requires this procedure. ICE would apply FOIA exemptions b(6), b(7)(C) to protect the individuals from

unwarranted invasion of privacy. The privacy interests of the individuals would outweigh any public

interest in the disclosure of that information. Additional sensitivities regarding release of agency

personnel names are outlined below as it relates specifically to maintaining technical processes as part of

their job responsibilities.

31.     ICE is obligated to maintain the confidentiality of the employees' names to prevent a

social engineering attack on its systems. Social engineering can begin with obtaining the names of

employees, establishing regular contact, and then gaining the confidence of an authorized user which

could lead to the employee unknowingly revealing information that could compromise the network's

security. Social engineers often rely on the natural helpfulness of people to carry out an attack.

32.     The release of specific names of employees or specific units/divisions within ICE
responsible for monitoring the automated processes would permit an individual with malicious intent to
directly target that specific employee or office because they know which employee to reach out to or
which office to contact. In addition, this specific information also provides a potential attacker with  the
"inside information" that would allow the intruder to appear credible and gain trust when posing as a
legitimate insider in efforts to gain even more valuable and sensitive information pertaining to ICE
information systems. Employees responsible for monitoring the automated processes involved with
preparing an extract are in trusted positions and have access to sensitive information concerning official
law enforcement activities by ICE. The disclosure of their identities could make these employees the
target of unauthorized inquiries and harassment for unauthorized access to the agency databases by
unauthorized individuals. Furthermore, release of employee names could make them prime targets for
potential compromise or bribery.

33.     One type of computer-based social engineering targeting, or ruse, is known as "Spear
Phishing." This method of targeting is clearly defined in paragraph 18 of the *Declaration of J. Thomas
Foster's in Support of the United States Department of Homeland Security's Motion for Summary
Judgment*, dated January 14, 2016: "'Spear Phishing' is an even more focused version of 'phishing'
attacks and combines tactics, such as targeting specific individuals for the communications,
personalizing the emails, impersonating a known sender, and using other techniques to bypass email
filters and trick targets into clicking a link or opening an attachment. The personalization and
impersonation used in the spear phishing emails can be extremely accurate and compelling."

34.     To further emphasize the threat posed by spear phishing and to identify exactly how
easily systems can be hacked, one can point to a number of articles depicting hacked high-profile email
accounts. In a recent report published by *The Hill*, teenage hackers utilized phishing to break into CIA

14

Director John Brennan's personal email account, as well as the home phone and email accounts of John Holdren, President Obama's senior advisor on science and technology. Per the article, "[t]hey set all of [John Holdren's] calls to forward to the Free Palestine Movement, as they did in a hack of Director of National Intelligence James Clapper's personal accounts last week. The hackers gained access to Holdren's account through a simple phishing scheme, according to Motherboard. [The hacker] sent [Holdren's wife] Cheryl an email claiming to be Mr. Holdren. [2]

35.     As a result, the Agency would additionally apply FOIA Exemption (b)(7)(E) to protect from disclosure information compiled for law enforcement purposes, the release of which would disclose law enforcement guidelines, such as the names of individuals responsible for monitoring the automated process for preparing extracts, which are not well known to the public and, if disclosed, could reasonably be expected to risk circumvention of the law. Having access to the documentation and specifically to the names of the employees responsible for monitoring the automated extract preparation processes defeats the layered security approach needed to protect the security of the Agency's information systems and, further, subjects the Agency's employees to harassment and compromise.

### D. FOIA Request III –"[T]he recipient(s) of that extracts/snapshots"

36.     Records containing the entities designated as the intended recipients of prepared snapshots or extracts from EID would include information which overlaps with FOIA Requests I and II in that the information about these automated processes of receipt of snapshots or extracts would be included in technical documentation found in the following categories on the Supplemental *Vaughn* Index (Doc. 17-4 filed October 9, 2014) and an Amended Detailed Description Table (Doc. 25-4 filed January 28, 2015): Interface Control Agreement (ICA), Interface Control Document (ICD), System Requirements Document (SRD), Interface Design Document (IDD), and Interface Test Plan.

---

[2] http://thehill.com/policy/cybersecurity/266279-teenagers-hackers-who-breached-cia-head-hit-white-house-official.

37.    Regarding sensitivity of the records or information responsive to the above portion of FOIA Request III, as mentioned in Sections II and VI of the *Declaration of Jeff Wilson in Support of the United States Department of Homeland Security's Motion for Summary Judgment*, dated October 2, 2014 (Document 17-6 filed October 9, 2014), the process for receiving extracts or snapshots is automated and occurs through a link established between two databases with no tangible extract files.

38.    Nevertheless, there is always a person, or persons, who, as part of their job description, are responsible for monitoring the successful execution of that automated process in receiving the extract data. As job duties and responsibilities, as well as personnel, shift constantly, there is no single document that outlines a specific person responsible for monitoring this automated process of receipt of the extract data at all times. Further, ICE would assert FOIA exemptions b(6), b(7)(C) to protect from disclosure information pertaining to third parties who have not provided consent. Without the explicit consent of the individual(s) named in the records sought, ICE may not release the records to the public. Protecting the privacy interests of individuals who may be named in ICE records, which are the target of FOIA requests, requires this procedure. ICE would apply FOIA exemptions b(6), b(7)(C) to protect the individuals from unwarranted invasion of privacy. The privacy interests of the individuals would outweigh any public interest in the disclosure of that information.

39.    Additional sensitivities regarding release of personnel names are outlined below as it relates specifically to maintaining and monitoring technical processes as part of their job responsibilities.

40.    The EID is owned and operated by ICE and is used primarily to support the law enforcement activities of certain Department of Homeland Security (DHS) components, including U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP). EID is the common database repository for all records created, updated, and accessed by a number of software applications.

16

41.     Just as described above in paragraphs 28-35, describing the release of information related to individuals responsible for monitoring the automated process of preparing the extracts, release of information that identifies the recipient responsible for monitoring the automated process of receiving the extracts would permit an individual with malicious intent to directly target that specific employee or office because they know which employee to reach out to or which office to contact.  Further, it would provide potential attackers with specific inside information to allow them to appear to be a credible and authentic person with "need to know" information for targeted spear-phishing attacks– but in this case, since the recipient may be from another agency, it would provide the attacker with valuable information to conduct a spear-phishing attack on a federal agency external to ICE, as well.

42.     Employees of other DHS components such as U.S. Citizenship and Immigration Services (USCIS) and Customs and Border Protection (CBP), as well as employees of external Federal agencies such as the Department of State who are responsible for monitoring the automated process of receiving the extract/snapshot prepared by ICE from EID also hold trusted positions and have access to sensitive information concerning official law enforcement activities by ICE by virtue of their receipt. The disclosure of their identities could make these Federal employees the target of unauthorized inquiries and harassment for unauthorized access to Federal agency databases by unauthorized individuals. Furthermore, release of recipient employee names could make them prime targets for potential compromise or bribery.  As reiterated in the *Declaration of J. Thomas Foster's in Support of the United States Department of Homeland Security's Motion for Summary Judgment*, dated January 14, 2016, in paragraph 21, "Since ICE does not have control over the security of the non-ICE-systems interconnected to EID and IIDS, it is even more critical that technical documentation pertaining to EID and IIDS, not be disclosed. Disclosure of ICE technical documentation in conjunction with an interconnected but

comprised system belonging to another federal agency could certainly compromise the integrity and availability of the Agency's data and impede its ability to carry out its mandated mission."

43.     Accordingly, the Agency would additionally apply FOIA Exemption (b)(7)(E) to protect from disclosure information compiled for law enforcement purposes, the release of which would disclose law enforcement guidelines, such as the names of individuals responsible for monitoring the automated process for receiving extracts, which are not well known to the public and, if disclosed, could reasonably be expected to risk circumvention of the law. Having access to the documentation and specifically to the names of the employees responsible for monitoring the automated processes for receipt of extracts defeats the layered security approach needed to protect the security of the Agency's information systems and, further, subjects the Federal employees to harassment and compromise.

### E.  FOIA Request III –"[T]he EID system time required in their preparation"

44.     ICE does not maintain records on the amount of time that is required to prepare each extract. The Agency only maintains the start times of the scheduled extracts. Stop times are not maintained by the agency as they are not fixed times. For example, one extract may take twice as long as another depending on the amount of data being processed. The start times can be found in technical documentation that describes access to the EID found in the following categories on the Supplemental *Vaughn* Index (Doc. 17-4 filed October 9, 2014) and an Amended Detailed Description Table (Doc. 25-4 filed January 28, 2015): Interface Control Agreement (ICA); Interface Control Document (ICD), System Requirements Document (SRD), Interface Design Document (IDD), and Interface Test Plan.

45.     Each system lifecycle document must stand on its own; therefore, information may be repeated in various documents for contextual purposes thus records identifying any extracts and snapshots may also be found in the following document categories:  Version Description Document (VDD), Notice of Intent to Release (NIR), Data Management Plan (DMP), Production Readiness

Review (PRR), Implementation Plan, Development Test Analysis Report (DTAR), Integration

Readiness Review (IRR), Request for Deviation (RFD), Production Readiness Review (PRR)

Development Test Plan (DTP), Data Schema, Test Readiness Review (TRR) Approval Certification,

Release Readiness Review (RRR) Approval Certification, Risk Assessment (Word/PDF), Production

Readiness Review (PRR) Summary, Test Readiness Review (TRR) Summary, Contingency Plan,

Project Schedule, Independent Test Analysis Summary, Independent System Test Plan, Requirements

Traceability Matrix (RTM), Release Readiness Review (RRR) Summary, Configuration Management

(CM) Plan Graphics, Risk Assessment, Project Tailoring Plan (PTP), Project Management Plan (PMP),

Test Installation Review (TIR), Security Test and Evaluation (ST&E) Plan, Fact Sheet, System Security

Plan (SSP), Operations Manual, Training Plan, Design Document (DD), Test Readiness Review (TRR),

(TRR) Approval Letter (AL), Migration Plan, DHS ICCB e-mail from ICE OCIO, Test Installation

Review (TIR) Summary, Configuration Management (CM) Plan, Maintenance Release Notice,

Production Tasks Work Instructions, Sensitive System Security Plan (SSSP), Functional Requirements

Document (FRD), Independent System Test Analysis Summary, Design Document (DD) Schema, Test

Coverage Matrix (TCM), Test Installation Review (TIR) Completion Letter, Interfaces and Integration

Transition Inventory, Interfaces and Integration Transition Inventory Project Schedule, Data Dictionary,

Promotion Implementation Plan, Planning Review Summary, Planning Review Approval Certification,

Requirements Review Summary, Requirements Review Approval Certification, Preliminary

Architecture and Design Review (PADR) Summary, Preliminary Architecture and Design Review

(PADR) Approval Certification, User Manual, Data Migration Plan, Design Review Presentation,

System Workload Analysis Document (SWAD), Preliminary Architecture and Design Review (PADR)

PowerPoint, Data Mapping Document, and the Technical Design Document (TDD).

19

46.     Regarding the sensitivity of the records or information responsive to the last portion of

FOIA Request III stated above, that particular information in the hands of an individual with malicious

intent would have serious security implications for a law enforcement database.

47.     Release of documents that record the start time could assist a potential attacker in many

ways. The perpetrator would know exactly what time to stage an attack. For example, knowing that a

system is updated every Monday starting at 1am and every Thursday at 10pm provides key windows

into system vulnerability. Having this "insider information" also gives the attacker more credibility and

increases their chances in orchestrating a social engineering attack. The perpetrator's newly found

institutional knowledge could then assist them in obtaining more critical information from an

unknowing employee, again increasing the chances of attack on ICE systems.

48.     Additionally, just like knowledge of the frequency of extracts described above in

Subsection B, paragraphs 22-27, the knowledge of start time for preparation of extracts allows the

potential attacker to limit the amount of time they need to surveil a system, which in turn limits the time

during which they can be detected by the Agency. Knowledge of the preparation time also informs a

more specific and more convincing spear-phishing attack because intruders can reference specific times

that only an authorized user should know thereby establishing credibility. It is analogous in the physical

world of knowing when the bank vault is opened.

49.     Accordingly, the Agency would apply FOIA Exemption (b)(7)(E) to protect from

disclosure information compiled for law enforcement purposes, the release of which would disclose law

enforcement guidelines, such as fixed extract preparation start times, which are not well known to the

public and, if disclosed, could reasonably be expected to risk circumvention of the law. Having access to

the records that contain start time for extract preparation defeats the layered security approach needed to

protect the security of ICE and other Federal agency information systems.  Accordingly, these records as

requested in FOIA Request III are considered law enforcement sensitive as detailed in the Supplemental *Vaughn* Index (Doc. 17-4 filed October 9, 2014) and an Amended Detailed Description Table (Doc. 25-4 filed January 28, 2015) .

## V.    SENSITIVITY OF FOIA REQUEST III ELEMENTS WHEN AGGREGATED

50.    If the elements of who, what, where, why, and how are woven together to provide an advanced knowledge of the internal environment of a database system, the likelihood of an attack would increase significantly. Recreating events that depict start time, users, responsible parties, recipients, and frequency of events provides the user with an advantage in determining the most vulnerable aspects to the systems. They can begin to model and predict outcomes that could detrimentally impact mission critical operations for our interconnected systems and agencies.

51.    As stated in paragraph 19 of the *Declaration of J. Thomas Foster's in Support of the United States Department of Homeland Security's Motion for Summary Judgment*, dated January 14, 2016, "The complexity of connectivity raises concerns that there is no such thing as true isolation for the EID and IIDS databases. Even one small piece of sensitive information could be used as the springboard of a key mechanism to construct a successful attack. Internally, ICE has many other database systems that interconnect with EID and IIDS. Because of this interoperability among the various agency systems, all of these additional systems are also put at risk by release of EID and IIDS technical documentation. Since no protection layer is foolproof, each layer is equally important to deploy. One of these protection layers, or techniques, is to limit the number of persons who have knowledge of the design of the system (a concept known as "least privilege"). Just as thieves will study physical layout, vault location, blueprints, wiring diagrams, personnel habits and shifts to determine the weakest points and most likely avenues of success for a robbery, skilled cyber attackers will do similar research using publically

available information, network diagrams, database schemas, etc. to determine the most vulnerable entry points to sensitive systems and data."

52.    Each piece of this request – appearing to be insignificant when contained in separate requests, could be assembled to display a more complete picture of our systems and used to defeat our protection of these systems. In the cyber security profession, this is called "mosaic analysis", an assembly of desperate pieces to illuminate a larger picture. When taken together in response to a detailed FOIA request, the government is required to consider this in securing our data systems. Accordingly as referenced above, the Agency would apply FOIA Exemption (b)(7)(E) to protect from disclosure information compiled for law enforcement purposes, the release of which would disclose law enforcement guidelines, which would include each individual element of FOIA Request III, which are not well known to the public and, if disclosed, could reasonably be expected to risk circumvention of the law. Additionally, the Agency would assert FOIA exemptions b(6), b(7)(C) to protect from disclosure information pertaining to third parties who have not provided consent, specifically any names of those persons monitoring the automated processes of preparation and receipt of the extracts.

## VI.    JURAT CLAUSE

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief. Signed this $\underline{2^{nd}}$ day of February 2016.

Jeff Wilson
Unit Chief, Information Technology Management Unit
Law Enforcement and Systems Analysis
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
500 12th Street, S.W., Stop 5009
Washington, DC 20536-5009