# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN B. LONG, *et al.* )<br><br>Plaintiffs, )<br><br>v. )<br><br>U.S. IMMIGRATION AND )<br>CUSTOMS ENFORCEMENT, *et al.* )<br><br>Defendants. ) | No. 1:14-CV-00109-APM |

## DECLARATION OF J. THOMAS FOSTER
## IN SUPPORT OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY'S
## MOTION FOR SUMMARY JUDGMENT

## I.      INTRODUCTION

I, J. Thomas Foster, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am an Information Technology ("IT") Specialist with a concentration in Information Security in the Office of the Chief Information Officer Information Assurance Division at U.S. Immigration and Customs Enforcement ("ICE"). I have held this position since August 10, 2015. Prior to this position, I was a Senior Security Consultant with the MITRE Corporation supporting the U.S. Department of Homeland Security (DHS) and U.S. Department of Health and Human Services (HHS) from January 2011 until August 2015. From February 2008 until January 2011, I was responsible for running the Security Exchange Commission (SEC) (SAIC) Security Operation Center (SOC) activities. From August 1999 until February 2008, I served as the Director of Information Security at Fannie Mae . In addition, I have held intelligence positions within the U.S. Department of Defense (DoD) since 1985. Specifically I held intelligence positions with the Defense Information Systems Agency from 1994 until 1999 and the Office of Naval Intelligence from 1985 until 1994. I

1

am a Certified Information System Security Professional (CISSP) from the International Information Systems Security Certification Consortium, Inc., ["(ISC)²®"].

2. ICE OCISO is responsible for the overall security of the ICE technological and operational environment, including systems, user access, internal and external compliance, and security authorization of IT systems. The division oversees the entire IT Security program including: managing ICE compliance with all Federal laws and regulations pertaining to IT security; monitoring and maintaining institutional knowledge on emerging Federal security trends and threats; directing ICE's Cyber Security Program, and supporting other Office of the Chief Information Officer ("OCIO") programs and projects to ensure IT Information Security. The ICE OCISO mailing address is 801 I Street, N.W., Washington, D.C. 20536.

3. As an Information Security IT Specialist in ICE OCISO, my official duties are Cyber Threat Intelligence, SOC operations, and incident response.

4. I make this supplemental declaration in support of ICE's Motion for Summary Judgment in the above-captioned action. The statements contained in this declaration are based upon my personal knowledge, my review of the technical information requested by the Plaintiff, federal information security requirements and standards, Mr. Paul C Clark's declarations dated November 13, 2014 and March 26, 2015, recent publically-available reports on cyber-attacks directed at the federal government, the Court's Order dated December 14, 2015, as well as, information provided to me during the course of my official duties.

5. This declaration is intended to supplement the October 8, 2014 Declaration of Karolyn Miller (Doc. 17-1 filed October 9, 2014) and the January 12, 2015 Supplemental Declaration of Jeff Wilson (Doc. 25-1filed January 28, 2015) to explain in further detail how the disclosure of technical documentation (records identifying each and every database table, descriptions of all fields of information stored in each of the database tables, records defining each code used in recording data, database schema, and records identifying the database software) requested

by the plaintiffs that pertains to the U.S. Immigration and Customs Enforcement's, Enforcement Integrated Database (EID) and the ICE Integrated Decision System Database (IIDS) could reasonably be expected to risk a cyber-attack against the Agency's databases and/or other circumvention of the law.

## II.  DESCRIPTION OF CYBER-ATTACK SCENARIOS IN ADDITION TO SQLI ATTACKS AND POTENTIAL BUSINESS IMPACT ON THE ICE MISSION

6.  In their declarations Karolyn Miller (Doc. 17-1 filed October 9, 2014) and Jeff Wilson (Doc. 25-11 filed January 28, 2015) provided descriptions of federal security requirements and standards, recent publically-available statistics on cyber-attacks, and explained how the technical information being requested by the Plaintiffs may be used to conduct various types of cyber-attacks against ICE information systems and data.

7.  Mr. Paul C. Clark's declarations dated November 13, 2014 (Doc.19-3 filed November 13, 2014) and March 26, 2014 (Doc. 27-2 filed March 30, 2015), contested Ms. Miller's argument stating that SQLI can be successful only against databases having an externally facing web interface, and that neither the Enforcement Integrated Database (EID) nor the ICE Integrated Decision Support System (IIDS) are public-facing systems. However, Mr. Clark's declaration did not definitively negate the fact that the risk of other types of cyberattacks or malicious intrusions against EID and IIDS exist regardless of the lack of an externally facing web interface or direct connection.

8.  An externally facing web interface or a direct connection to the internet is not required to expose data contained in internal systems, such as EID or IIDS, to malicious intrusions. While the Miller declaration discussed the SQLI attack vector as being one of the most prevalent, this is only one of the many types of malicious intrusions, as noted in the Supplemental Declaration of Jeff Wilson (Doc. 25-11 filed January 28, 2015), that can

negatively impact the EID and IIDS systems and consequently the ICE mission, should the

database technical information be disclosed.

9.  The lack of an externally facing web interface does not ensure that a system is immune from

an attack. Likewise, there is no single tool that prevents a database system from being

compromised. Consequently, ICE implements "Defense in Depth" as a practical strategy for

achieving Information Assurance in today's highly networked environments. "Defense in

Depth" is a strategy that seeks to delay the advance of an attacker by deploying obstacles that

help detect an attack before it is completed. The placement of protection mechanisms,

procedures, and policies is intended to increase the dependability of an IT system, while

multiple layers of defense prevent direct attacks against critical systems. In terms of

computer network defense, defense in depth measures are developed to both prevent security

breaches and to provide an organization time to detect and respond to an attack and so reduce

and mitigate the consequences of a breach. Providing information about the database tables,

structure, and metadata itself can point individuals with malicious intent directly to the

targeted information thereby undermining the "defense in depth" approach and increasing the

likelihood that agency systems may be compromised. No single security measure can

adequately protect a network or a system; there are simply too many methods available to an

attacker for this to be successful.


**UNAUTHORIZED ACCESS**


10. In today's world, adversaries employ multiple methods of attack against a desired targeted

database system from multiple vantage points, from within and from outside the system. In

response, ICE deploys multiple layers of protection to resist these different types of attacks.

Since no protection layer is foolproof, each layer is equally important to deploy. One of

these protection layers, or techniques, is to limit the number of persons who have knowledge of the design of the system (a concept known as "least privilege"). Just as thieves will study physical layout, vault location, blueprints, wiring diagrams, personnel habits and shifts to determine the weakest points and most likely avenues of success for a robbery. Skilled cyber attackers will do similar research using publically available information, network diagrams, database schemas, etc. to determine the most vulnerable entry points to sensitive systems and data. The more detailed information the cyber attacker can acquire, like database schemas, the greater an advantage they gain in acquiring the information they have targeted. They will use information to mount more successful social engineering attacks. For instance, these attackers might call the help desk posing as an employee and convince them to reset his password or send an email with a Trojan (malicious computer program that is misrepresented to be beneficial) to one employee posing as another employee. These attacks tend to be very successful because the attacker can be very believable by appearing to be very knowledgeable referencing names of upper management or having specific information regarding a system of interest. Once the attacker has gained access to the network, more intelligence gathering will begin. For instance, the attacker may scan the network and connected systems for data or passwords or the attacker might probe other systems for vulnerabilities. With this additional information, the attacker may mount attacks on other interconnected systems.

**PHISHING**

11. "[M]ore than two-thirds of incidents that comprise the Cyber-Espionage pattern [over the previous two years] have featured phishing."[1] "Phishing" is a type of malicious intrusion

---

[1] Verizon Data Breach Investigations Report, http://resources.infosecinstitute.com/the-cyber-exploitation-life-cycle/, is an annual publication which has been produced by the Verizon RISK (Research, Investigations, Solutions, Knowledge) team within Verizon's Enterprise Services business unit since 2008. The report's data set combines data from public and private organizations around the world, including law enforcement agencies, national incident-

designed to acquire sensitive information, such as usernames and passwords, by masquerading as a trustworthy entity in an electronic communication, i.e., email. These e-mails frequently look normal, and the sender or subject even may seem familiar to the recipient. This is a favored method because attackers have learned that internet facing defenses, such as firewalls, can be defeated by first gaining an unauthorized foothold in the internal network rather than via an external point of access, thus allowing them to proceed with more damaging attacks from inside the firewall. Accordingly, although the EID and IIDS databases are not public facing, attackers are still able to infiltrate, for example via emails sent, opened, and the interjection of malware, into internal networks as an initial phase of an attack, as evidenced by several examples described below on government infrastructure. They can use knowledge of database schema, database software versions and other system technical documentation to attack the application from inside the firewalls.

12.   Unauthorized access is frequently the first step in the progression of a malicious attack, which can escalate into data or software program modification, theft, destruction, etc. Representative of the unauthorized access attack is the theft of usernames and passwords that allow the attacker to gain privileged ("super user") access to a system or database. As part of the "Defense in Depth" approach, ICE grants privileged access only to a limited number of personnel based on job responsibilities, and allows so called "super users" permission to modify, update, and even delete data in very sensitive portions of a database system. It should be noted that just as there are considerable restrictions on the individuals identified as super-users, so are there stringent restrictions on the number and nature of agency personnel permitted to access the exact technical documentation being requested by

reporting entities, research institutions, private security firms and Verizon. In 2015, the report compiled information from more than 79,000 incidents, including over 2,100 confirmed data breaches from 70 contributing organizations spanning across 61 countries. This report is a standard resource used by the IT industry.

the Plaintiffs. Restriction to access is part of the layered approach to security, and the disclosure of sensitive database technical documentation pertaining to EID and IIDS increases the risk of an unauthorized person gaining access to a privileged account and restricted data.

13. Detailed knowledge of technical system aspects not known by the public including operating system versions, database schema, and interfaces in conjunction with publically available Privacy Act compliance documents (Systems of Records Notices and Privacy Impact Assessments[2]), can reduce the time and effort required for an attacker to penetrate, infiltrate, and exploit key systems, and retrieve and exfiltrate target data before being detected. According to security firm Mandiant (now a division of FireEye), once an attacker has gained a foothold into an internal network and established adequate system privileges, the attacker begins internal network reconnaissance. Advanced knowledge of the internal environment and target data that will be attacked could greatly reduce the time it takes for an attacker to perform reconnaissance and deny network defenders the additional time needed to identify the intrusion and stop the attacker before sensitive information can be downloaded and exfiltrated. According to Information Warfare Monitor[3], the purpose of the reconnaissance

---

[2] http://www.dhs.gov/sites/default/files/publications/privacy-piaupdate-eid-september2015_0.pdf
- DHS/ICE/PIA-015 (f) Enforcement Integrated Database, April 8, 2014, PDF 10 pages, 233 KB.
- DHS/ICE/PIA-015 (e) Enforcement Integrated Database ENFORCE - EAGLE Update, July 25, 2012 .
- DHS/ICE/PIA-015(d) Enforcement Integrated Database (EID) ENFORCE Alien Removal Module Update, April 6, 2012
- DHS/ICE/PIA-015(c) Enforcement Integrated Database (EID) ENFORCE Alien Removal Module Update, November 7, 2011
- DHS/ICE/PIA-015(b) Enforcement Integrated Database (EID), May 20, 2011
- DHS/ICE/PIA-020(a) Alien Criminal Response Information Management System (ACRIMe) & Enforcement Integrated Database (EID) Update, September 29, 2010
- DHS/ICE/PIA-015 Enforcement Integrated Database (EID) January 14, 2010 (PDF, 29 pages – 420.65 KB)

- DHS/ICE-011 - Immigration Enforcement Operational Records System (ENFORCE)

[3] The Information Warfare Monitor (IWM) closed in 2012. The IWM was a research project established by Ronald Deibert from the Citizen Lab at the Munk School of Global Affairs, University of Toronto and Rafal Rohozinski from the The SecDev Group (formerly the Advanced Network Research Group, University of Cambridge, UK).The research was supported by was supported by the Canada Centre for Global Security Studies (University of Toronto),

phase is to collect more information regarding the system's internal environment. The

attacker may execute commands to inquire the system information, thus getting to know the

current network connections, programs installed, lists of recent documents, and hardware

statistics (Information Warfare Monitor, 2009). Again, if the attacker can gain this

information beforehand it will reduce the time and effort required to compromise sensitive

data since attack planning can begin before the network intrusion occurs. Also according to

Mandiant, "data of interest may have many forms and be in various places, but primarily

encompass sensitive files and documents, databases, or contents of e-mail accounts which are

stashed in files or e-mail servers and domain controllers (Mandiant, 2013)."[4]

## ADVANCED PERSISTENT THREAT INTRUSIONS

14. The disclosure of database technical documentation also places the EID and IIDS at risk of

Advanced Persistent Threat (APT) intrusions. An APT is a type of attack in which an

unauthorized person gains unauthorized access, by gaining a foothold as explained above, to

a network and stays there undetected for some period of time. The intention of an APT attack

is to steal data rather than to cause damage to the network or organization. The persons

normally involved with these types of attacks gain unauthorized access by using knowledge

of data such as database information, structure, schema, standard user accounts, or

compromised systems and then proceed to increase the capabilities and privileges they have

gained to the level granted to system administrators, application administrators, software

developers, and database administrators. The more specific, detailed information about a

---

a grant from the John D. and Catherine T. MacArthur Foundation, in-kind and staff contributions from the SecDev Group, and a donation of software from PalantirTechnologies Inc. Additional information about project objectives and accomplishments is available at: *http://www.infowar-monitor.net/reports/IWM-Project%20Publishable%20Summary.pdf*
[4] http://resources.infosecinstitute.com/the-cyber-exploitation-life-cycle/

system that an attacker has, the easier it is to fine-tune attack methods and target areas of data and personnel of specific interest for purposes of circumventing the law.

15. Recent cyber-attacks on federal systems have shown that information obtained through unauthorized access can be built upon to extend the scope and severity of an attack and information about the technical environment assists an attacker by lessening the amount of time needed to build a scenario. As an example of a cyberattack that can occur without an externally facing web interface or direct connection, in June 2015, the United States Office of Personnel Management (OPM) announced that it had been the target of a data breach targeting the records of as many as four million people. Information targeted in the breach included personally identifiable information, such as Social Security numbers, as well as names, dates and places of birth, and addresses. The hack went deeper than initially believed and likely involved theft of detailed security-clearance-related background information. The estimate of the number of stolen records has increased to 21.5 million. This included records of people who had undergone background checks, but who were not necessarily current or former government employees. Hackers likely gained access to OPM's local-area network by stealing credentials and then planting malware and creating a backdoor for exfiltration. Less than six months later, with information gathered during the original OPM attack, the hackers pivoted to the Interior Department data center where OPM's personnel records resided and siphoned the data away. Hackers gained access to OPM's networks via credentials stolen from a government contractor; hackers did not gain access through an external point of access. [5]

16. In another instance in which an external facing website was not needed to circumvent the law, in November 2015, a hacker group broke into the FBI's Law Enforcement Enterprise

---

[5] https://fcw.com/articles/2015/08/21/opm-breach-timeline.aspx

Portal (LEEP), which connects local and federal law enforcement officials and allows local, state and federal agencies to share information, including of ongoing investigations. They also indicated they had access to areas, such as the Homeland Security Information Network (HSIN). The hackers obtained a list of about 3,000 names, titles, email addresses and phone numbers for Federal Bureau of Investigation (FBI) employees, and other federal agencies as well as various local police and sheriff's departments (including ICE field agents). The personal information was posted to Pastebin, a public internet site where information can be stored in plain text, and the hackers threatened to release more data at some future time.[6]

17. Release of information, such as the data stolen in these attacks, increases the potential for more targeted attacks, which can take the form of a campaign to send very legitimate looking "phishing" or "spear phishing" emails with the intent of getting unauthorized access to the ICE law enforcement sensitive data. These attacks circumvent many of the preventive and detective cybersecurity controls, such as firewalls and intrusion detection systems, and therefore, pose a greater threat due to the increased likelihood of a successful attack.

## SPEAR PHISHING

18. "Spear Phishing" is an even more focused version of "phishing" attacks and combines tactics, such as targeting specific individuals for the communications, personalizing the emails, impersonating a known sender, and using other techniques to bypass email filters and trick targets into clicking a link or opening an attachment. The personalization and impersonation used in the spear phishing emails can be extremely accurate and compelling. Use of technical information, such as that requested by the plaintiff, would increase the likelihood that the attack will not be perceived as malicious because the presence of actual technical information creates a sense of authenticity and believability to the message. Once a

---

[6] http://thehill.com/policy/national-security/259461-hackers-breach-fbi-portal

link is clicked or attachment opened, the foothold in the network is established allowing spear phishers to move forward with the advanced attack. Armed with the technical documentation pertaining to EID and IIDS, malicious intruders are able to access and navigate the entire law enforcement database and its sensitive contents. The risk of data corruption, erasure, and modification is high. Spear phishing can also be the first stage of an APT attack.  If a spear phishing attack was successful, the scope of such a breach would be widespread and costly not just in financial terms but, also in the magnitude of harm it would introduce to the mission of ICE and other Federal partners.

## INTERCONNECTIONS WITH OTHER SYSTEMS

19. EID shares data with and receives data from many different data stores. Release of technical documentation on the EID and IIDS databases has the potential to place other systems at risk of attack through these interconnections and interfaces, as occurred in the FBI breach discussed in Paragraph 16 above. The complexity of connectivity raises concern that there is no such thing as true isolation of the EID and IIDS databases. Even one small piece of sensitive information could be used as the springboard or key mechanism to construct a successful attack.

20. Internally, ICE has many other database systems that interconnect with EID and IIDS. Because of this interoperability among the various Agency systems, all of these additional systems are also put at risk by release of EID and IIDS technical documentation. Because of the sensitive nature of this information, the names of the specific systems are not included in this declaration but can be made available for *in camera* inspection.

21. Additionally systems operated by other federal agencies, including the Department of Justice, U.S. Customs and Border Protection, U.S. Bureau of Prisons, U.S. Department of State, Transportation Security Administration, Social Security Administration, Department of Treasury, and U.S. Citizenship and Immigration Services are interconnected to ICE's EID and IIDS databases. Because of the sensitive nature of this information, the names of the

specific systems are not included in this declaration but can be made available for *in camera* inspection. Because ICE does not have control over the security of the non-ICE systems interconnected to EID and IIDS, it is even more critical that technical documentation pertaining to EID and IIDS, not be disclosed. Disclosure of ICE technical documentation in conjunction with an interconnected but compromised system belonging to another federal agency could certainly compromise the integrity and availability of the Agency's data and impede its ability to carry out its mandated mission.

## VI.   JURAT CLAUSE

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief. Signed this 14th of January 2016.

1/14/2016



X

J. Thomas Foter

Signed by: JAMES T FOSTER

J. Thomas Foster,
IT Specialist (Information Security)
Office of the Chief Information Security Officer
Office of the Chief Information Officer
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
801 I Street, N.W., Mailstop 5804
Washington, DC 20536