## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN B. LONG, *et al.* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil No. 1:14-cv-109 (APM) |
| v. | ) |
| | ) |
| IMMIGRATION AND CUSTOMS | ) |
| ENFORCEMENT, *et al.* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On December 14, 2015, the Court issued a Memorandum Opinion and Order granting in part and denying in part Defendant U.S. Immigration and Customs Enforcement ("ICE") and Defendant, Customs and Border Protection ("CBP") (collectively "Defendants" or the "Agency"), motion for Motion for Summary Judgment.  In the Court's opinion, the Court held that Defendants had yet to meet their burden of showing that the disclosure of the EID and IIDS metadata and database schema, requested by Plaintiffs on October 13, 2010 and October 18, 2010, would increase the risk of a cyber-attack, data breach, or any other circumvention of the law, for withholding the information pursuant to Exemption 7(E).  *See* December 14, 2015 Memorandum Opinion ("Mem Op."), ECF #29, at 13 – 18.  The Court also found that Defendants had yet to explain the details of the search conducted by ICE to locate extract identification and preparation records associated with Plaintiffs' September 21, 2012 request, which the Court referred to as Freedom of Information Act ("FOIA") request III.  *See id.* at 29 – 30.  The Court granted Defendants summary judgment with respect to all other issues in the matter.

On February 2, 2016, Defendants submitted supplemental evidence in support of their claims.  Defendants submitted three declarations addressing both the risk of circumvention of the law under Exemption 7(E), and Defendants' search, processing, and application of Exemptions to request III.  In that there are no remaining issues of disputed fact, and Defendants have fulfilled their obligations under the applicable FOIA provisions, Defendants now move for summary judgment based upon their supplemental evidence.

I.    **DEFENDANTS PROPERLY APPLIED EXEMPTION 7(E)**

As previously explained, Exemption 7(E) permits the withholding of law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law[.]"  5 U.S.C. § 552(b)(7)(E).  "To show that ... documents were compiled for law enforcement purposes, the [agency] need only establish a rational nexus between [an] investigation and one of the agency's law enforcement duties and a connection between an individual or incident and a possible security risk or violation of federal law."  *Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (internal citations and quotation marks omitted).

The D.C. Circuit has explained that "Exemption 7(E) sets a relatively low bar for the agency to justify withholding: 'Rather than requiring a highly specific burden of showing how the law will be circumvented,'" this exemption "'only requires that the agency demonstrate logically how the release of the requested information might create a risk of circumvention of the law.'"  *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1194) (D.C. Cir. 2009); *see also id.* ("[T]he exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of

circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk.") (internal quotation marks omitted).

First, the Court in its December 14, 2015, properly held that the records in question were "compiled for law enforcement purposes."  *See* Mem Op. at 11 ("Thus, records concerning how these databases are constructed and how they operate – like the data itself – clearly have a rational 'nexus' to Defendants' law enforcement duties.  The second prong of the 'law enforcement purpose' test is also satisfied because of the clear connection between the records and possible security risks or violations of law.  These are not the kind of records compiled for generalized snooping of individuals' lives, but were prepared to effectuate the agencies' law enforcement responsibilities.  The court thus concludes that the withheld records easily qualify as records or information 'compiled for law enforcement purposes.'").

The Court also held that information in question qualifies as law enforcement "techniques," procedures," or "guidelines."  *See* Mem Op. at 12 – 14 ("[T]he court ultimately agrees with Defendants based on the Court of Appeals' decision in *Blackwell v. FBI*, 646 F.3d 37 (D.C. Cir. 2011), as well as analogous district court cases. . . . *Blackwell* and these district court decisions teach that internal database codes, fields, and other types of identifiers used by law enforcement agencies to conduct, organize, and manage investigations and prosecutions qualify, at least, as law enforcement guidelines, if not also law enforcement methods and techniques. Thus, the court rejects Plaintiffs' argument that the EID and IIDS metadata and database schema do not qualify for withholding under Exemption 7(E)").

Finally, the Court addressed the issue of whether the requested information "could reasonably be expected to risk circumvention of law."  5 U.S.C. § 552(b)(7)(E).  As previously

explained, to meet the applicable standard, Defendants need only show that disclosure of the subject information would *risk* circumvention of the law.  *See Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009) ("The IRS does not have to prove that circumvention is a necessary result; the statute exempts information that would '*risk* circumvention of the law.' Showing a risk, of course, is a lower standard than showing a certainty. But the statute does not stop there. Rather than requiring the IRS to prove a risk of circumvention, the statute exempts information that would '*be expected* to risk circumvention of the law.' Risk of circumvention is not required—only an expectation of such a risk. Moreover, this expectation of a risk of circumvention need not be undeniable or universal; the *risk* need only be '*reasonably*' expected.) (internal citations omitted); *Mayer Brown LLP*, 562 F.3d at 1194 ("Although some FOIA exemptions set a high standard . . . the text of exemption 7(E) is much broader. . . . "Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the IRS "demonstrate[ ] logically how the release of [the requested] information might create a risk of circumvention of the law.'") (citing *PHE, Inc. v. DOJ*, 983 F.2d 248, 251 (D.C. Cir. 1993)).  *Mayer Brown LLP*, 562 F.3d at 1196 ("While there may be some legitimate uses of the requested information, the potential for misuse amply supports the IRS's argument for exemption.").

In its opinion, the Court focused on whether the release of the requested information would create a risk of a cyber-attack.  *See* Mem Op. at 13 – 19.  The Court held that Defendants had yet to meet their burden and determined that "in the exercise of its discretion, the court will permit Defendants to supplement the record with additional affidavits or other evidence to establish that disclosure of the IED and IIDS metadata and database schema will increase the risk of a cyber-attack, data breach, or any other circumvention of the law."  *Id.* at 19.  On January 14,

2016, J. Thomas, Foster (Mr. Foster), an Information Technology Specialist with the Office of the Chief Information Officer, Information Assurance Division at U.S. Immigration and Customs Enforcement, provided a declaration further explaining the risk of circumvention of law associated with the release of the requested information.  *See generally* January 14, 2016 Declaration of J. Thomas Foster ("Foster Decl.") (ECF# 32-3).  Defendants now move for summary judgment.

In his declaration Mr. Foster explains that potential hackers may access Defendants' system and utilize the requested information to launch an attack without a public interface.   Mr. Foster also offers examples of recent devastating attacks that occurred without a public interface and further explains that the requested information makes potential attacks more efficient and deadly and that the requested information places other agencies at risk.  Defendants have, accordingly, established a *risk* of circumvention of law.

### A.      Electronic-Mail based Attacks Don't Require Public Interface

In briefing their Motion for Summary Judgment, Defendants explained that access to the requested database schema, and eventual breach of the systems in question, could provide access and potential manipulation of information related to ongoing investigations, the identity of informants and even result in the changing or manipulation of fugitive and deportation information.  *See generally* Defendant's Motion for Summary Judgment ("Def's Mt.") ECF # 17. Mr. Foster further confirms that once inside the system hackers "can use knowledge of database schema, database software versions and other system technical documentation to attack the application from inside the firewalls," and that "if the attacker can gain this [database schema] information beforehand it will reduce the time and effort required to compromise sensitive data since attack planning can begin before the network intrusion occurs."  *See* Foster. Decl at ¶¶ 11,

13.  Plaintiffs have never disputed that the database schema they seek can result in catastrophic results through access and manipulation of information as outlined by the October 8, 2014 Declaration of Karolyn Miller ("Miller Decl.") submitted as Exhibit 1 in support of Defendants' Motion for Summary Judgment.  Plaintiffs, instead, simply assert that because Defendants' databases lack a public interface, the databases cannot be breached at all, and therefore the use of the requested information once inside the system does not create a risk of circumvention of law. Plaintiff's assertions do not take into account the use of electronic-mail to breach systems and accordingly stand at odds with actual examples of system breaches occurring throughout the federal government.

Contrary to Plaintiff's assertions, Mr. Foster's declaration establishes that Defendants may be at risk of circumvention of law despite the fact that the systems in question do not require a public interface.  In his declaration, Mr. Foster explains that "[a]n externally facing web interface or a direct connection to the internet is not required to expose data contained in internal systems, such as EID and IIDS, to malicious intrusions."  *See* Foster. Decl at ¶ 8.  Mr. Foster explains that the "lack of an externally facing web interface does not ensure that a system is immune from an attack" and that "there is no single tool that prevents a database system from being compromised."  *Id*. at ¶ 9.

*Phishing*

One example of a hacker's ability to launch an attack against a system without an external database is a method known as phishing.  "'Phishing' is a type of malicious intrusion designed to acquire sensitive information, such as usernames and passwords, by masquerading as a trustworthy entity in an electronic communication, i.e., email."  *Id*. at ¶ 11.  Mr. Foster explains, however, that phishing e-mails can be used for more than simply obtaining information

but can be used as a means for breaching firewalls and launching an attack inside the system without an external access point. *Id*. ("This is a favored method because attackers have learned that internet facing defenses, such as firewalls, can be defeated by first gaining an unauthorized foothold in the internal network rather than via an external point of access, thus allowing them to proceed with more damaging attacks from inside the firewall."). Mr. Foster further explains that "although the EID and IIDS databases are not public facing, attackers are still able to infiltrate, for example via emails sent, opened, and the interjection of malware, into internal networks as an initial phase of an attack, as evidenced by several examples described below on government infrastructure." *Id* .

### Spear Phishing

Furthermore, attackers could utilize a more targeted electronic-mail based phishing attack to gain access to Defendants' systems, without an externally facing web interface or a direct connection, known as spear phishing. Spear phishing "attacks and combines tactics, such as targeting specific individuals for the communications, personalizing the emails, impersonating a known sender, and using other techniques to bypass email filters and trick targets into clicking a link or opening an attachment." Foster. Decl at ¶ 18. Mr. Foster explains that "personalization and impersonation used in the spear phishing emails can be extremely accurate and compelling," and that "[u]se of technical information, such as that requested by the plaintiff, would increase the likelihood that the attack will not be perceived as malicious because the presence of actual technical information creates a sense of authenticity and believability to the message." *Id*. "Once a link is clicked or attachment opened, the foothold in the network is established allowing spear phishers to move forward with the advanced attack." *Id*.

With access to the system possible with a mere clicking of a link or opening of an attachment, phishing based attacks on systems have become more prevalent and "[m]ore than two-thirds of incidents that comprise the Cyber-Espionage pattern over the previous two years have featured phishing." *See id*. at ¶ 11 (internal quotation omitted). Accordingly, Plaintiffs' assertion that any attack on the systems in question require an external interface are without support.

### *Stolen Credentials*

Finally, the scope of an attack can be increased through access of stolen credentials, and the release of the database schema may help aid in such an effort. Mr. Foster explains that stolen credentials and information often starts from mere access through a phishing e-mail and then elevates through "Advanced Persistent Threat" (APT) intrusions. "An APT is a type of attack in which an unauthorized person gains unauthorized access, by gaining a foothold as explained above, to a network and stays there undetected for some period of time." Foster. Decl at ¶ 14. "The persons normally involved with these types of attacks gain unauthorized access by using knowledge of data such as database information, structure, schema, standard user accounts, or compromised systems and then proceed to increase the capabilities and privileges they have gained to the level granted to system administrators, application administrators, software developers, and database administrations." *Id*. Mr. Foster explains that "disclosure of database technical documentation [] places the EID and IIDS at risk of [APT] intrusions," and that the "more specific, detailed information about a system that an attacker has, the easier it is to fine-tune attack methods and target areas of data and personnel of specific interest for purposes of circumventing the law." *Id*.

B.    **Examples of Recent Attacks Without Public Interface**

Mr. Foster's declaration provides two specific examples of breaches of government systems without the use of a public interface, the 2015 attack on the United States Office of Personnel Management (OPM) and a 2015 attack on the Federal Bureau of Investigation's (FBI) Law Enforcement Enterprise Portal (LEEP).  Mr. Foster explains that "an example of a cyberattack that can occur without an externally facing web interface or direct connection" is the recent attack on OPM.  *See* Foster. Decl at ¶ 15.  Mr. Foster explained that in June 2015 OPM "announced that it had been the target of a data breach targeting the records of as many as four million people."  *Id*.  Mr. Foster explains that the "hack went deeper than initially believed and likely involved theft of detailed security-clearance related background information," and that the "estimate of the number of stolen records has increased to 21.5 million."  *Id*.  Mr. Foster explains that "[h]ackers likely gained access to OPM's local-area network by stealing credentials and then planting malware and creating a backdoor for exfiltration."  *Id*. ("Hackers gained access to OPM's networks via credentials stolen from a government contractor; hackers did not gain access through an external point of access.").

Mr. Foster also provides "another instance in which an external facing website was not needed to circumvent the law," citing to the November 2015 breach of an FBI system.  Mr. Foster explains that a hacker group broke into the FBI's LEEP system, "which connects local and federal law enforcement officials and allows local, state and federal agencies to share information including of ongoing investigations." Foster. Decl at ¶ 16.  The hackers released information regarding FBI employees, local police and sheriff's departments onto the internet and threatened to release more data in the future.  *See id*.  The same hacking group "also indicated they had access to areas such as the Homeland Security Information Network."  *Id*.

"Recent cyber-attacks on federal systems have shown that information obtained through unauthorized access can be built upon to extend the scope and severity of an attack and information about the technical environment assists an attacker by lessening the amount of time needed to build a scenario." *Id*. at ¶ 15.  "These attacks circumvent many of the preventive and detective cybersecurity controls, such as firewalls and intrusion detection systems, and therefore pose a greater threat due to the increased likelihood of a successful attack." *Id*. at ¶ 17.

     **C.**     <u>Release of Database Schema Undermines Defendants' Safeguards and Makes Attacks Easier and More Efficient</u>

Release of the requested database schema undermines Defendants' safeguards and makes attacks easier and more efficient.  While a would-be attacker may be able to breach a system through phishing, Defendants implement safeguards in the hope that such a breach can be contained.  Indeed, "ICE implements 'Defense in Depth' as a practical strategy for achieving Information Assurance in today's highly networked environments."  Foster. Decl at ¶ 9.  Mr. Foster explains that "'Defense in Depth' is a strategy that seeks to delay the advance of an attacker by deploying obstacles that help detect an attack before it is completed.  The placement of protection mechanisms, procedures, and policies is intended to increase the dependability of an IT system, while multiple layers of defense prevent direct attacks against systems. . . .[D]efense in depth measures are developed to both prevent security breaches and to provide an organization time to detect and respond to an attack and so reduce and mitigate the consequences of a breach." *Id*.

Mr. Foster goes on to explain that the release of database schema for the databases in question will serve to undermine the "Defense in Depth" security structure Defendants have put into place and increase the chances that any breach will produce catastrophic results.  *See* Foster. Decl at ¶ 9 ("Providing information about the database tables, structure, and metadata itself can

10

point individuals with malicious intent directly to the targeted information thereby undermining the 'defense in depth' approach and increasing the likelihood that agency systems may be compromised."); *Id.* at ¶ 12 ("As part of the 'Defense in Depth' approach, ICE grants privileged access only to a limited number of personnel based on job responsibilities, and allows so called 'super users' permission to modify, update, and even delete data in very sensitive portions of a database system. . . . [T]here [are] stringent restrictions on the number and nature of agency personnel permitted to access the exact technical documentation being requested by the Plaintiffs.  Restriction to access is part of the layered approach to security, and the disclosure of sensitive database technical documentation pertaining to EID and IIDS increases the risk of an unauthorized person gaining access to privileged account and restricted data."); *Id.* at ¶ 13 ("Detailed knowledge of technical system aspects not known by the public including operating system versions, database schema, and interfaces in conjunction with publically available Privacy Act compliance documents [], can reduce the time and effort required for an attacker to penetrate, infiltrate, and exploit key systems, and retrieve and exfiltrate target data before being detected.").  In that the database schema Plaintiffs seek increases the ability to effectively mount an attack on Defendants' computer systems, Defendants have effectively shown that the release of information creates the *risk* of circumvention of law.

      D.      <u>The Release of the Requested Information Places Other Agencies at Risk</u>

      Finally, a would-be-attacker could use the database schema, without a public interface, to attack Defendants' EID and IIDS databases through a compromised interconnected system, and the release of the database schema requested by Plaintiffs places other agencies at risk.  Mr. Foster has explained that once inside a system an attacker can search for information related to interconnected systems and potentially breach those systems.  *See* Foster Decl. at ¶ 10 ("Once

the attacker has gained access to the network, more intelligence gathering will begin.  For instance, the attacker may scan the network and connected systems for data or passwords or the attacker might probe other systems for vulnerabilities.  With the additional information, the attacker may mount attacks on other interconnected systems.").  Accordingly, a public interface is not necessary to launch an attack on Defendants' systems and, relatedly, an enhanced ability to quickly, efficiently, and effectively mount an attack on Defendants' systems, based upon release of database schema, places other security systems at risk.

First, a public interface is unnecessary to use the requested information to launch an attack, but an attack can be launched through interconnected systems.  Mr. Foster explains in his declaration that "EID shares data with and receives data from many different data stores. Release of technical documentation on the EID and IIDS databases has the potential to place other systems at risk of attack through these interconnections and interfaces, as occurred in the [2015] FBI breach."  *Id*. at ¶ 19.  "The complexity of connectivity raises concern that there is no such thing as true isolation of the EID and IIDS databases.  Even one small piece of sensitive information could be used as the springboard or key mechanism to construct a successful attack." *Id*.  Mr. Foster further explains that "ICE has many other database systems that interconnect with EID and IIDS," and specifically notes that "systems operated by other federal agencies, including the Department of Justice, U.S. Customs and Border Protection, U.S. Bureau of Prisons, U.S. Department of State, Transportation Security Administration, Social Security Administration, Department of Treasury, and U.S. Citizenship and Immigration Services are interconnected to ICE's EID and IIDS databases."  *Id*. at ¶¶ 20, 21.  Mr. Foster explains that "[d]isclosure of ICE technical documentation in conjunction with an interconnected but compromised system belonging to another federal agency could certainly compromise the

integrity and availability of the Agency's data and impede its ability to carry out its mandated mission." *Id.* at ¶ 21. Accordingly, an attacker may use the database schema to launch an attack, without a public interface, if it has gained access to an interconnected system that has been compromised.

Likewise, if the databases in question are compromised, they place a number of interconnected systems at risk. In addition to the risk of a full-scale breach upon access to the system, the release of the requested database schema places systems operated by the Department of Justice, Department of State, and a number of other agencies at risk. Defendants have, accordingly, demonstrated how the release of the requested information creates the *risk* of circumvention of law and Defendant is, accordingly, entitled to summary judgment. *See Strunk v. U.S. Dept. of State*, 905 F.Supp.2d 142, 147 – 148 (D.D.C. 2012) ("Although the computer transaction and function codes are not themselves 'techniques and procedures for law enforcement investigations or prosecutions' entitled to categorical protection under Exemption 7(E), the CBP's declarant adequately demonstrates, [through its argument that "release of this information 'facilitates access to and navigation through TECS and reveals mechanisms for access to and navigation through TECS'], that release of the codes, as well as the information in the RSLT column, 'would disclose guidelines for law enforcement investigations or prosecutions, and that such disclosure could reasonably be expected to risk circumvention of the law.'") (quoting 5 U.S.C. § 552(b)(7)(E)); *Skinner v. U.S. Dep't of Justice*, 893 F.Supp.2d 109, 112 – 14 (D.D.C. 2012) ("The USCIS invokes Exemption 7(E) 'to protect internal computer access codes associated with a hyper-sensitive law enforcement database containing homeland security information, *i.e.*, TECS. . . . [U]nauthorized access to TECS by computer hackers endangers ongoing investigations 'by exposing informants, witnesses, and other highly sensitive

13

information,' leading, for example, to witness intimidation and destruction of evidence.  Lastly,

because the CBP's law enforcement databases are connected to databases maintained by other

federal agencies, the declarant explains that any 'distortion of … information contained in TECS

could … impair other agencies' law enforcement operations and missions.  . . . Here, the

declarant not only describes the TECS database in detail, but also explains the link between

disclosure of authorized users' access codes and the many ways individuals could exploit the

information to circumvent the law or to corrupt the database itself.  Although the computer

access codes are not themselves 'guidelines for law enforcement investigations or prosecutions'

entitle to categorical protection under Exemption 7(E), the declarant adequately demonstrates

that release of the codes 'would disclose guidelines for law enforcement investigations or

prosecutions, and that such disclosure could reasonably be expected to risk circumvention of the

law.'") (quoting 5 U.S.C. § 552(b)(7)(E)).

## II.     DEFENDANTS ARE ENTITLED TO JUDGMENT WITH RESPECT TO FOIA REQUEST III

Defendants are also entitled to summary judgment with respect to FOIA request III.  As

previously stated, the adequacy of a search for records requested is "determined not by the fruits

of the search, but by the appropriateness of its methods."  *Hodge v. F.B.I.*, 703 F.3d 575, 579

(D.C. Cir. 2013) (quoting *Iturralde v. Comptroller of the Currency,* 315 F.3d 311, 315

(D.C.Cir.2003)).  "In order to prevail on summary judgment, 'the agency must show that it made

a good faith effort to conduct a search for the requested records, using methods which can be

reasonably expected to produce the information requested.'"  Mem Op. at 29 (quoting *Oglesby v.

Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).  Accordingly, the Agency's affidavits need not

"set forth with meticulous documentation the details of an epic search for the requested records,"

but "affidavits that explain in reasonable detail the scope and method of the search conducted by

the agency will suffice to demonstrate compliance with the obligations imposed by the FOIA." *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982).

On September 21, 2012, Plaintiffs submitted a FOIA request (hereinafter referred to as FOIA Request III) seeking "a copy of records identifying any extracts and 'snapshots' prepared from the Enforcement Integrated Database over the last 12 months, along with records relating to the frequency with which such extracts and snapshots have been prepared, who was responsible for preparing any snapshot or extract, the recipient(s) of that extracts/snapshots, as well as the EID system time required in their preparation during the period." January 13, 2016, Supplemental Declaration of Fernando Pineiro ("Jan. 2016 Pineiro Decl.") (ECF# 32-1) at ¶ 6. Accordingly, Plaintiffs' FOIA requests sought five categories of documents, (a) documents identifying extracts and "snapshots" prepared for the previous 12 months; (b) records related to the frequency with which extracts/snapshots are prepared; (c) the individuals responsible for preparing extracts/snapshots; (d) documents identifying the recipient(s) of the extract/snapshots; and (e) the amount of time it takes the EID system to prepare reports. Defendants fulfilled their FOIA obligations with respect to each of the categories of documents listed and are, accordingly, entitled to summary judgment.

### A. Defendants' Search for Responsive Documents

Despite knowledge that many of the categories of documents requested did not exist, and the large scope of the request with respect to copies of the extracts/snapshots, Defendants chose to undertake a search for responsive records "using methods [] reasonably expected to produce the information requested.'" Mem Op. at 29; *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Defendants are, accordingly, entitled to summary judgment.

Upon receipt of the subject FOIA request, Defendants undertook a "review [of] the substance of the request" and determined which program component contained "subject matter expertise" and then forwarded the request "to specific individuals and component offices, and direct[ed] specific employees to conduct searches of their file systems (including both paper files and electronic files), which in their judgment, based on their knowledge of the manner in which they routinely keep records, would be reasonably likely to have responsive records, if any." Jan. 2016 Pineiro Decl. at ¶ 11.  Based on the substance of the instant request, Defendants directed the request to the Office of the Chief Information Officer because that office "provides information technology services and products that enable ICE and DHS to meet their respective mission and to deliver innovative information technology and business solutions that enable ICE to protect and secure the nation." *See id.* at ¶¶ 13, 14.

The Office of the Chief Information Officer conducted its own "review of the substance of the request" and made a separate determination regarding which "specific employees [should] conduct searches of their file systems (including both paper files and electronic files) which in their judgment, based on their knowledge of the manner in which they routinely keep records, would be reasonably likely to have responsive records, if any." *Id*. at ¶ 15.  The Office of the Chief Information Officer "determined that the subject matter experts within the Systems Development Division [] at the Headquarters level should conduct the search." *Id*. at ¶ 16.

Subject matter experts within the Systems Development Division interpreted the request as seeking "1) information regarding EID data replicated to various environment; how often, and to whom; 2) information regarding EID data provided through interfaces; how often, and to whom; and 3) information regarding EID data shared through EID services; how often, and to whom." Jan. 2016 Pineiro Decl. at ¶ 16.  Based on the search criteria outlined above, subject

matter experts in the Systems Development Division conducted searches of their electronic and

paper file systems for responsive records, after receiving instructions on October 4, 2012.  *See id*.

at ¶¶  15 – 17.  The search resulted in a nine page responsive document that was processed and

released to Plaintiffs on January 25, 2013, with portions redacted pursuant to Exemptions (b)(6),

(b)(7)(C), and (b)(7)(E).  *See id*. at ¶ 17.  The "nine (9) pages that were released were entitled

"EARM Interfaces Summary for FOIA Request" with the document being "created in an effort

to respond to plaintiffs' FOIA request III."  February 2, 2016 Supplemental Declaration of Jeff

Wilson ("Feb. 2016 Wilson Decl.") (ECF# 32-2) at ¶ 6.  The nine page document "is not a

document that is kept or maintained by ICE in its normal course of business," and "is not located

within the system lifecycle management (SLM) repository where the other responsive documents

reside."  *Id*.

Finally, Defendants did not conduct a separate search of the SLM Repository for

responsive documents to Plaintiff's FOIA request III because, due to the nature of the documents

requested in all three FOIA requests, such a search would be duplicative of the searches run for

Plaintiffs' Requests I and II and "the SLM repository was reviewed in its entirety for responsive

documents" and a detailed description "of all documents contained in the entire SLM repository"

were listed in Defendants' Supplemental *Vaughn* Index (ECF # 17-4) and Amended Detail

Description Table (ECF # 25-4).  *Id*. at ¶ 12.  Any additional information, related to FOIA

Request III, not captured in Defendants' initial 2013 search "is either located in the same SLM

repository as the documentation requested in FOIA Requests I and II, and in many cases overlaps

with that documentation directly, or is not captured and documented in any documentation, such

as the names of the employees responsible for monitoring the automated process involved with

preparing an extract, the names of persons responsible for monitoring the automated processes

involved with receiving an extract, and the system time required for preparation of the extracts. This would make further searching for documentation in response to FOIA Request III duplicative." *Id.* at ¶ 13. In that Defendants are not required to conduct duplicative searches, and Defendants adequately searched for responsive records, Defendants are entitled to summary judgment. *See Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 363 (4th Cir. 2009) ("Substantial portions of the requests overlapped, and wholly new and independent searches for each request would be duplicative and without a discernible benefit. Simply put, the FOIA did not require the USPTO to perform an entirely new, duplicative search for each request.").

### B.     Copies of Extracts/Snapshots

Defendants have fulfilled their obligations with respect to Plaintiffs' request for records "identifying any extracts and 'snapshots' prepared from EID over the last 12 months." First, the Court has held that copies of the extracts / snapshots need not be produced in the instant case because they include more than 6.7 billion rows of data and "producing and redacting the requested snapshots would be unduly burdensome." Mem Op. at 23 – 24. Furthermore, records responsive to Plaintiffs' broad requests for "identifying" snapshots may be found in approximately seventy (70) different categories of documents in the SLM Repository. *See* Feb. 2016 Wilson Decl. at ¶ 16. Mr. Wilson's supplemental declaration explains that "[t]hese records include information describing access to EID and sensitive database technical documentation regarding EID" and Defendants assert Exemption 7(E) with respect to the identifying documents requested. *See id.* at ¶¶ 16, 21.

As previously stated, Exemption 7(E) permits the withholding of law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions

if such disclosure could reasonably be expected to risk circumvention of the law[.]"  5 U.S.C. §

552(b)(7)(E).  The responsive documents include detailed system analysis of the EID system and

"[t]he more system information that ICE releases to the public [regarding this particular law

enforcement system], the more susceptible the agency is to an attack, which can subsequently

prevent ICE from carrying out the Agency's mission."  *Id.* at ¶ 17.  Mr. Wilson further explains

that the "information describing the access of EID and interplay between the EID and other

systems or repositories, which would include extracts and snapshots taken from EID over the last

12 months, should be strictly managed and restricted," and limiting access to such information is

part of the Agency's "layered approach to security."  *Id.* at ¶ 20.

Ultimately, Defendants assert Exemption 7(E) "to protect from disclosure information

compiled for law enforcement purposes, the release of which would disclose law enforcement

guidelines, such as information describing how two systems interface, technical details, specific

data element exchanged between the systems, as well as hardware and software specification,

which are not well known to public and, if disclosed, could reasonably be expected to risk

circumvention of the law."  *Id.* at ¶ 21.  "Disclosure of the information could allow someone to

understand the design and functionality of the system and therefore undermine it by exploiting a

revealed vulnerability.

### C.    The Frequency with Which Extracts/Snapshots are Prepared

Defendants also assert Exemption 7(E) to Plaintiffs' requests for records "relating to the

frequency with which such extracts and snapshots have been prepared."  Defendants list more

than fifty (50) categories of documents where the frequency documents may be found and

explain that release of the EID's technical data "can reduce the time and effort required for an

attacker to penetrate, infiltrate, and exploit key systems, and retrieve and exfiltrate target data

before being detected." *See* Feb. 2016 Wilson Decl. at ¶¶ 23 – 24.  Defendants further explain

that "access to the detailed technical plans which divulge the frequency or timeline of events

adds yet another layer of information that could allow a perpetrator to recreate a similar system

which could be utilized as a model in an attack against ICE systems.  In other words, if an

attacker knows that an extract occurs each day rather than monthly, it can shorten the time an

attacker needs to surveil a network, providing both a shorter time to learn more about the

network while also leaving less time to be discovered." *Id*. at ¶ 26.

"In addition, [providing data regarding the frequency snapshots are prepared] gives an

attacker ability to tailor attacks so that they go unnoticed.  For instance [] modifying information

just before an interface starts and changing it back immediately upon completion would cause

erroneous data to be sent to stakeholders, and possibl[y] never corrected because the integrity of

data obtained directly from a system of record is seldom challenged." *Id*.  Accordingly,

Defendants assert that "the detailed technical plans that contain the information regarding

frequency of extracts as requested in FOIA Request III are [] law enforcement sensitive" and

Defendants properly assert Exemption 7(E).

## D.    Individuals Responsible for Creating Extracts/Snapshots

Defendants have also fulfilled their FOIA obligations with respect to Plaintiffs' request

for records related to the names of individuals responsible for preparing snapshots or extracts

from EID.  "The specific names of points of contact for those who monitor the automated

process of preparing the extracts and those monitoring the automated process of receipt of the

extracts, . . . were requested from and provided by ICE employees using their institutional

knowledge of ICE in an effort to provide a response to [] the FOIA Request III.  These names are

not contained within any technical documentation and are not captured by the Agency on a

routine basis." Feb. 2016 Wilson Decl. at ¶ 7.  Defendants are not required to create new documents in response to a FOIA request and Defendants are entitled to summary judgment. *See American Civil Liberties Union v. U.S. Dept. of Justice*, 655 F.3d 1, 4n.3 (D.C. Cir. 2011) ("Although FOIA only requires a government agency to disclose 'agency records improperly withheld,' 5 U.S.C. § 552(a)(4)(B), and does not 'impose[ ] [any] duty on the agency to create records.') (quoting *Forsham v. Harris,* 445 U.S. 169, 186 (1980)).

Further, while creation of the extract/snapshot is an automated process, there are "person, or persons, who, as part of their job description, are responsible for monitoring the successful execution of that automated process." *See id*. at ¶¶ 28, 30.  To the extent Plaintiffs seek the names of those individuals, and to the extent such information was captured in the nine redacted pages, Defendants assert Exemptions 6 and 7(C) to protect the individuals' privacy interests.

As stated in Defendant's Motion for Summary Judgment, FOIA Exemption 6 protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The term "similar files" has been interpreted "to cover detailed Government records on an individual which can be identified as applying to that individual." *See U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). "The information in the file 'need not be intimate' for the file to satisfy the standard, and the threshold for determining whether information applies to a particular individual is minimal." *Milton v. DOJ*, 783 F.Supp.2d 55, 58 (D.D.C. 2011) (quoting *N.Y. Times Co., v. NASA*, 920 F.2d 1002, 1006 (D.C. Cir. 1990)).

"Once this threshold determination is met, a court next inquires whether disclosure would compromise a 'substantial' privacy interest because FOIA requires the release of information 'if no significant privacy interest is implicated.'" *Ayuda Inc. v. Federal Trade Commission*, --

21

F.Supp.3d --, 2014 WL 4829574 at *8 (D.D.C. 2014) (quoting *Multi Ag Media LLC v. U.S. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008).  "This standard, however, 'means less than it might seem,' as a substantial privacy interest is 'anything greater than a *de minimis* privacy interest.'  If a substantial privacy interest exists, a court next tests whether release of such information would constitute a 'clearly unwarranted invasion of personal privacy,' by balancing 'the privacy interest that would be compromised by disclosure against any public interest in the requested information.'"  *Id.* (internal citations omitted).

Likewise, FOIA Exemption 7(C) protects from disclosure information in law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  "Though Exemptions 6 and 7(C) both require agencies and reviewing courts to undertake the same weighing of interests, the balance under Exemption 7(C) 'tilts more strongly toward nondisclosure' because its "privacy language is broader than the comparable language in Exemption 6[.]'"  *Ayuda Inc. v. Federal Trade Commission*, -- F.Supp.3d --, 2014 WL 4829574 at *15 (D.D.C. 2014) (quoting *DOJ v. Reporters Com. for the Freedom of Press*, 489 U.S. 749, 756 (1989)).  "The Supreme Court has explained that these phrasing differences reflect Congress's choice to provide 'greater protection' to law enforcement materials than to 'personnel, medical, and other similar files.'  Thus, the D.C. Circuit consistently has held that Exemption 7(C) 'establishes a lower bar for withholding material [than Exemption 6].'"  *Id.* (quoting *ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011)) (internal citations omitted).

In the instant case, Defendants "assert FOIA exemptions b(6), b(7)(C) to protect from disclosure information pertaining to third parties who have not provided consent" and the "privacy interests of the individuals would outweigh any public interest in the disclosure of that

information." *See* Feb. 2016 Wilson Decl. at ¶ 30.  Indeed, "[t]he release of specific names of

employees or specific units/divisions within ICE responsible for monitoring the automated

processes would permit and individual with malicious intent to directly target that specific

employee or office because they know which employee to reach out to or which office to

contact." *Id*. at ¶ 32.  "In addition, the specific information also provides a potential attacker

with the 'inside information' that would allow the intruder to appear credible and gain trust when

posing as a legitimate insider in efforts to gain even more valuable and sensitive information

pertaining to ICE information systems." *Id*.  Disclosure of the identities of "[e]mployees

responsible for monitoring the automated process" "could make these employees the target of

unauthorized inquiries and harassment for unauthorized access to the agency databases by

unauthorized individuals," and "could make them prime targets for potential compromise or

bribery." *Id*.

Defendants note that the threat of targeted attacks or "spear phishing" are prevalent and

Mr. Wilson points to two examples, the breach of the CIA's Director's personal e-mail and the

breach of President Obama's senior advisor on science and technology as another.  *See* Feb.

2016 Wilson Decl. at ¶ 34 ("To further emphasize the threat posed by spear phishing and to

identify exactly how easily systems can be hacked, one can point to a number of articles

depicting hacked high-profile email accounts.  In a recent report published by *The Hill*, teenage

hackers utilized phishing to break into CIA Director John Brennan's personal email account, as

well as the home phone and email accounts of John Holdren, President Obama's senior advisor

on science and technology.").  In that Defendants have properly asserted Exemptions 6 and 7(C),

Defendants are entitled to summary judgment.  *See Stern v. FBI*, 737 F.2d 84, 91 (D.C. Cir.

1984) ("Because Exemption 7(C) provides protection for a somewhat broader range of privacy

23

interests than Exemption 6, privacy interests cognizable under Exemption 6 are cognizable under Exemption 7(C).”).

Finally, Defendants assert Exemption 7(E) to protect the names of the individuals responsible for creating the extracts/snapshots in question.  “Having access to the documentation and specifically to the names of the employees responsible for monitoring the automated extract preparation processes defeats the layered security approach needed to protect the security of the Agency’s information systems and, further, subjects the Agency’s employees to harassment and compromise.”  Feb. 2016 Wilson Decl. at ¶ 35.  Defendants, accordingly, assert Exemption 7(E) “to protect from disclosure information compiled for law enforcement purposes, the release of which would disclose law enforcement guidelines, such as the names of the individuals responsible for monitoring the automated process for preparing extracts, which are not well known to the public and, if disclosed, could reasonably be expected to risk circumvention of law.”  *Id*.  Defendants are, accordingly, entitled to summary judgment.

E.      **Recipients of Extracts/Snapshots**

Defendants assert Exemption 6, Exemption 7(C), and Exemption 7(E) to protect records identifying the entities designated as intended recipients of prepared snapshots or extracts from EID on the same grounds Defendants assert the Exemptions for the individuals overseeing the automated process.  The third parties receiving the data associated with the extracts/ snapshots “have not provided consent,” and “[w]ithout the explicit consent of the individual(s) named in the records sought, ICE may not release the records to the public.”  Feb. 2016 Wilson Decl. at ¶ 38.  Furthermore, “release of information that identifies the recipient responsible for monitoring the automated process of receiving the extracts would permit an individual with malicious intent to directly target that specific employee or office because they know which employee to reach

out to or which office to contact." *Id.* at ¶ 41.  "Further, it would provide potential attackers with specific inside information to allow them to appear to be a credible and authentic person with 'need to know' information for targeted spear-phishing attacks – but in this case, since the recipient may be from another agency, it would provide the attacker with valuable information to conduct a spear-phishing attack on a federal agency external to ICE, as well." *Id.*  Providing the names of recipients of snap shots will also leave them targets of "unauthorized inquires and harassment," "prime targets for potential compromise or bribery," and could potentially defeat Defendants' "layered security approach." *Id.* at ¶¶ 42 – 43.  Defendants, accordingly, properly asserted Exemptions 6, 7(C), and 7(E).

## F.      The Time it Takes to Prepare Extracts/Snapshots

Finally, Defendants fulfilled their FOIA obligations with respect to Plaintiffs' request for information regarding the "system time required in their preparation."  "[W]ith regard to the EID system time required for the preparation of extracts or 'snapshots,' the Agency does not capture the amount of EID system time required for the preparation of extracts.  The Agency does capture 'start times' . . . [but] the Agency does not capture 'stop times'[].  The Agency only maintains a record of fixed start times for extract preparations in the technical documentation.  Because the Agency does not capture 'stop times,' the times provided in the document released at the administrative level were requested of and provided by a knowledgeable subject matter expert or otherwise extrapolated from system audit logs."  Feb. 2016 Wilson Decl. at ¶ 8.  Indeed, "[s]top times are not maintained by the agency as they are not fixed times.  For example, one extract may take twice as long as another depending on the amount of data being processed." *Id.* at ¶ 44.

With respect to documents containing extract start times, potential responsive records exist in more than 50 categories of records and Defendants properly assert Exemption 7(E) to protect the information. *See id.* at ¶¶ 45, 49. "Release of documents that record the start time could assist a potential attacker in many ways. The perpetrator would know exactly what time to stage an attack. For example, knowing that a system is updated every Monday starting at 1 am and every Thursday at 10 pm provides key windows into system vulnerability. Having this 'insider information' also gives the attacker more credibility and increases their chances in orchestrating a social engineering attack." *Id.* at 47.

Furthermore, "knowledge of start time for preparation of extracts allows the potential attacker to limit the amount of time they need to surveil a system, which in turn limits the time during which they can be detected by the Agency. Knowledge of the preparation time also informs a more specific and more convincing spear-phishing attack because intruders can reference specific times that only an authorized user should know thereby establishing credibility." *Id.* at 48. "Having access to the records that contain start time for extract preparation defeats the layered security approach needed to protect the security of ICE and other Federal agency information systems," and Defendants, accordingly, properly applied Exemptions 7(E).

### G.    The Danger of the Requested Information in the Aggregate

Finally, a release of the information requested in FOIA Request III in the aggregate will serve to significantly increase the risk of a data breach. "If the elements of who, what, where, why, and how are woven together to provide an advanced knowledge of the internal environment of a database system, the likelihood of an attack would increase significantly. Recreating events that depict start time, users, responsible parties, recipients, and frequency of events provides the

user with an advantage in determining the most vulnerable aspects to the systems.  They can begin to model and predict outcomes that could detrimentally impact mission critical operations for our interconnected systems and agencies."  *Id.* at 50.

"Each piece of this request – appearing to be insignificant when contained in separate requests, could be assembled to display a more complete picture of [Defendants'] system and [be] used to defeat [the Agency's] protection of these systems.  In the cyber security profession, this is called 'mosaic analysis,' and assembly of desperate pieces to illuminate a larger picture.  When taken together in response to a detailed FOIA request, the government is required to consider this in securing [its] data systems."  *Id.* at 52.   Defendants, accordingly, properly applied Exemption 7(E), and other Exemptions and is entitled to summary judgment.

\*      \*      \*

Dated:  April 1, 2016,
        Washington, DC

Respectfully Submitted,

CHANNING D. PHILLIPS, D.C. Bar #415793
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar #924092
Civil Chief

By: */s/ Carl E. Ross* _____
CARL EZEKIEL ROSS, D.C. Bar #492441
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
Tel:  (202) 252-2533
Fax:  (202) 252-2505