## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SUSAN B. LONG, *et. al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:14-cv-109 (APM) |
| | ) | |
| IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

In its December, 14, 2015, ruling on the parties' cross-motions for summary judgment, this Court ordered ICE to make further submissions to substantiate its broad invocation of Exemption 7(E) with respect to database schema and other "metadata" concerning its Enforcement Integrated Database (EID) and Integrated Decision Support (IIDS) database, and to establish that it conducted an adequate search in response to the plaintiffs' request for records identifying extracts and "snapshots" of the EID and providing information about the creation of those extracts and snapshots. ICE's supplemental submissions and arguments come up short in both respects.

With respect to ICE's invocation of Exemption 7(E), the agency no longer argues that release of database schema could reasonably be expected to subject the

EID to the risk of "SQL injection attacks." Instead, ICE describes a number of possible scenarios in which government computer networks may be breached through means that do *not* require access to database schema, and argues that such attacks may be more likely or more successful if the attackers have access to information about the EID. ICE's speculative assertions fail to demonstrate that release of the requested information could be *reasonably* expected to create a risk, and the examples it offers to substantiate its fears do not support its claims. Indeed, those examples only prove that attacks on systems that (unlike the EID) have external access points neither require nor would be facilitated by the kind of information at issue here. More broadly, ICE's assertion that nearly any information about a government computer system would create a risk sufficient to satisfy Exemption 7(E) would have devastating effects on the efficacy of FOIA in an era when government information is increasingly maintained in computer records.

As for ICE's search for information responsive to the request for records identifying snapshots, ICE's supplemental submission makes clear that ICE has not attempted to identify and produce all reasonably segregable exempt information responsive to the request. And ICE's belated claim that all such information is exempt from production rests on assertions of vulnerability to cyber-attack that are even more overbroad than those it makes with respect to database schema. ICE's argument is also impossible to square with its own production of information concerning snapshots (including who creates them and when), which ceased only when an administrative appeal directed ICE to conduct a *complete* search for

responsive records. Again, ICE's claim that production of such routine information about the use of its systems is exempt would cripple FOIA as a usable tool to obtain access to electronic records maintained by the federal government.

## ARGUMENT

I. **ICE has failed to substantiate its claim that the release of database schema and other information about the structure of the EID and IIDS databases would be reasonably expected to create a risk of circumvention of the law.**

A. **The government's new declarations fail to establish that database schema and similar information facilitate cyber-attacks.**

In responding to this Court's summary judgment ruling requiring further submissions concerning whether release of information concerning its databases would pose a genuine risk of compromising the security of the EID, ICE has largely abandoned its original theory that the releases sought here would enable SQL injection attacks on the database. Instead, ICE has presented a grab-bag of information about various forms of cyber-attacks, none of which is more than tangentially related to the issues in this case. Indeed, ICE's submissions illustrate that government computer networks can be vulnerable to various forms of attack *regardless* of whether information about the structure of particular databases is available to potential attackers. Moreover, because information from ICE shows that access to its user networks does not by itself provide access to the EID, ICE has still failed to establish that if a cyber-attacker gained access to those networks through one of the methods outlined in the declarations it has submitted, that access would enable the attacker to do damage to the EID.

ICE's newly proffered computer security expert, J. Thomas Foster, spends most of his declaration describing the ways in which attackers gain access to networks by acquiring user credentials, such as user IDs and passwords, and by emailing malicious links to users. None of those methods depends on knowledge of database schema or other "metadata" concerning databases residing on the systems under attack, or on the manner in which such databases are used. Although Mr. Foster speculates that possession of such information might assist an attacker in gaining the confidence of an agency employee and persuading him or her to provide user credentials, he points to no examples of instances where an attack has actually made use of such information, nor any other reason to believe that the use of such information is in fact a method employed by cyber-attackers. *See* Declaration of Dr. Paul C. Clark ¶7 (May 17, 2016) (filed herewith and cited as "Third Clark Dec.").

Indeed, the Foster Declaration illustrates the point that concealing such information as database schema, including the codes identifying particular fields within a database, is useless as a means of protecting against attackers of the type described in the declaration. Once attackers are able to obtain access to a system, particularly the access available through obtaining credentials of privileged users, attackers who locate a database accessible on that system will also have access to the database schema and will thus be able to identify its contents without having had

advance knowledge of its structure or "metadata." *See* Third Clark Dec. ¶ 9.[1] Particularly if, as the Foster Declaration contemplates (at ¶ 10), such attackers are permitted to lurk undetected over a period of time, they are likely to obtain access to large amounts of information entirely without regard to whether they went in with knowledge of the type sought by the FOIA requests at issue here. *See* Third Clark Dec. ¶ 9.

Of course, the ability of attackers to obtain unauthorized access to particular information will depend on whether the networks they penetrate allow a connection to the system on which the relevant data resides. Such access depends on whether there is some point of external access—either a web-based interface, or an internet connection that allows a computer that has access to the data to be remotely controlled or monitored by an outside attacker. *See* Third Clark Dec. ¶ 6. Here again, ICE's declarations fall short of demonstrating that the type of attack they contemplate will provide such access. The declarations assert that the methods of attack they describe, through which attackers acquire user credentials or infect a networked computer with malicious software, may allow attackers access to ICE's network. But they fail to aver that such network access would be sufficient to allow access to or tampering with the EID itself, and they fail to answer the point that the materials ICE has already produced indicate that EID is actually isolated from

---

[1] *See also* Foster Dec. ¶ 9 ("The attacker may execute commands to inquire the system information, thus getting to know the current network connections, programs installed, lists of recent documents, and hardware statistics ....").

external access through a number of means. *See* Patterson Dec., Exh. A, at 13, 15–16, 19, 22, 26–28. ICE's declarations do not establish how that wall can be breached by the methods they describe. Instead, the Foster declaration avers vaguely that systems are "interconnected," that access to other agencies' systems could somehow be used to access the EID, and also that release of *any* technical information about the EID could somehow lead to access to "interconnected" systems maintained by other agencies. Foster Dec. ¶¶ 19–21. Those vague and overbroad assertions fall short of a specific explanation of how release of information about the EID could in fact create a reasonable risk to the EID data itself or to other systems. *See* Third Clark Dec. ¶ 6.

The principal example of the kind of breach that, according to Mr. Foster, will be threatened by the release of the information sought in the FOIA requests in this case is the Office of Personnel Management data breach discovered last year. Foster Dec. ¶ 15. That example only demonstrates the deficiencies in ICE's contention that the kind of structural information regarding databases sought here creates a risk of a similar breach. To begin with, the OPM breach does not appear to have been in any way attributable to the public release of information about the structure of OPM databases, nor to the attackers' having obtained advance information about database schema through some other means. *See* Third Clark Dec. ¶ 8. Rather, it appears they obtained access to OPM's systems through a method that has absolutely no connection to the availability of "metadata" concerning databases: They stole user credentials that had been inadequately secured by an OPM contractor. "[T]he hackers used compromised security credentials—those assigned to a KeyPoint

Government Solutions employee, a federal background check contractor working on OPM systems—to exploit OPM's systems and gain access."[2] The credentials allowed them months of unfettered access to OPM's systems, which in turn allowed them to siphon off information in at least two key databases, one containing information regarding government employees, and the other information regarding persons as to whom security clearance checks had been conducted.

As with the databases at issue here, the *existence* of those two databases was a matter of widespread public knowledge as a result of the Privacy Act's and E-Government Act's requirements that the government publish descriptions of such databases. Additional advance knowledge of the database schema was not necessary to allow the attackers to understand and make use of the information they acquired, because the database schema would have been stolen along with the rest of the database. *See* Third Clark Dec. ¶ 9. Far from illustrating that the information sought here would heighten the risk of an attack, the OPM breach illustrates that such information does not enhance the ability of attackers to obtain unauthorized access to government systems in the first place, nor to siphon off and make use of data if they are able to obtain unauthorized access.

Contrary to the government's assertions, the OPM breaches also fail to demonstrate that cyber-attacks can compromise the security of databases that lack a

---

[2] Congressional Research Service, *Cyber Intrusion into U.S. Office of Personnel Management: In Brief*, at 1 (July 17, 2015), *available at* https://www.fas.org/sgp/crs/natsec/R44111.pdf.

point of connection allowing access by an outsider. Although Mr. Foster suggests (at ¶ 15) that the OPM databases lacked an externally facing web connection, he cites nothing to substantiate that statement, and it appears to be flatly incorrect. Rather, it appears the attackers accessed OPM's network through an external access point using stolen credentials, *see* Third Clark Dec. ¶ 8. Moreover, OPM's security clearance databases were externally accessible through a "secure" web portal, and utilized a web-based system for processing background investigation forms.[3] Likewise, the Electronic Official Personnel Folder (eOPF) database maintained for OPM at an Interior Department data center is accessible both to employees and agency personnel managers through web-based portals.[4]

The security deficiencies that led to the OPM breach, and the proposed remedies for them, have nothing to do with public access to database schema and "metadata" concerning government databases. Rather, analysts have attributed the breach to such weaknesses in OPM's systems as its failure to implement proper user authentication requirements, its use of insecure software, its reliance on outside

---

[3] *See* Third Clark Dec. ¶ 9 (citing Sean Gallagher, *"EPIC" fail—how OPM hackers tapped the mother lode of espionage data*, Ars Technica (June 21, 2015), http://arstechnica.com/security/2015/06/epic-fail-how-opm-hackers-tapped-the-mother-lode-of-espionage-data/). *See also* OPM, *Use of Information Technology in OPM Background Investigations* (Feb. 2006), http://ncms-valleyofsun.org/ncms/OPM%20Technology%20Report%20-%20Security%20Clearances%20-%202006.pdf (describing internet-based access to OPM's databases concerning security clearances).

[4] *See* Third Clark Dec. ¶ 9 (citing OPM, *Data, Analysis & Documentation: Enterprise Human Resources Integration*, https://www.opm.gov/policy-data-oversight/data-analysis-documentation/enterprise-human-resources-integration/).

contractors, its failure to encrypt certain sensitive data, its failure to terminate remote sessions when a user logged off, its failure to impose time limits on access by privileged users, and its failure to monitor, and maintain logs of, the use of its systems.[5] OPM's own corrective measures include steps to address these weaknesses.[6] Notably, those measures do *not* include withholding public access to information about the nature of the data OPM collects in its databases. Furthermore, most of the corrective security measures adopted by OPM are *already* in place with respect to the EID, *see* Patterson Dec., Exh. A, at 26–28, and the government's declarants deny neither their existence nor their efficacy.

Mr. Foster's invocation of the data breach involving the Justice Department's Law Enforcement Enterprise Portal (LEEP) is similarly misplaced. Mr. Foster asserts that the LEEP example is "another instance in which an externally facing website was not needed to circumvent the law." Foster Dec. ¶ 9. But in fact, LEEP *is* an "externally facing" web portal through which, with a user name and a single password, an outsider can gain access to a broad array of federal law enforcement data. *See* Third Clark Dec. ¶ 8. The LEEP breach appears to have been attributable to a hacker's having obtained a password and to the extremely minimal measures

---

[5] *See*, *e.g.*, Gallagher, *"EPIC" fail*, *supra*; *see also*, *e.g.*, David Auerbach, *The OPM Breach Is a Catastrophe*, Slate (June 16, 2015), http://www.slate.com/articles/technology/future_tense/2015/06/opm_hack_it_s_a_catastrophe_here_s_how_the_government_can_stop_the_next.html; *see also* Class Action Complaint, *Am. Fed'n Gov't Employees v. OPM*, No. 1:15-cv-1015 (filed June 29, 2015)

[6] OPM, *Actions to Strengthen Cybersecurity and Protect Critical IT Systems* (June 2015), https://www.opm.gov/cybersecurity/cybersecurity-incidents/opm-cybersecurity-action-report.pdf.

taken by the government to secure the web portal.[7] Such an intrusion could not be expected to result from the public release of the schema of databases residing on thoroughly secured systems, such as the EID and IIDS.

More broadly, Mr. Foster cites no published sources or guidelines issued by executive branch officials or agencies responsible for data security advocating secrecy respecting the schema of government databases as a means of securing government computer systems against cyber-attacks. The OPM data breach and other incidents have generated intense executive branch scrutiny of federal information security, and a variety of new initiatives aimed at protecting it.[8] Quite notably, those initiatives do not feature secrecy concerning the structure of government databases containing public information as a means of securing government computer systems.

**B.     The government's assertion of Exemption 7(E) is unjustified and, if accepted, would impair FOIA's policies.**

ICE's claims that release of database schema and other "metadata" describing the contents of the databases pose an unacceptable risk of enabling cyber-attacks are also incoherent, as ICE fails to distinguish information it is now withholding from

---

[7] The LEEP portal is https://www.cjis.gov/CJISEAI/EAIController. For a description of the breach and the security flaws that apparently led to it, see Nextgov, *You Only Need One Password to Access the Allegedly Hacked Law Enforcement Databases* (Nov. 9, 2015), http://www.nextgov.com/cybersecurity/2015/11/you-only-need-one-password-access-allegedly-hacked-law-enforcement-databases/123537/.

[8] *See, e.g.*, White House, *FACT SHEET: Cybersecurity National Action Plan* (Feb. 9, 2016), https://www.whitehouse.gov/the-press-office/2016/02/09/fact-sheet-cybersecurity-national-action-plan; National Science & Technology Council, *Federal Cybersecurity Research and Development Strategic Plan* (Feb. 2016), https://www.whitehouse.gov/sites/whitehouse.gov/files/documents/2016_Federal_Cybersecurity_Research_and_Development_Stratgeic_Plan.pdf.

information it has previously provided. For example, although ICE now contends that providing the names of database fields creates risks of attacks, it makes no attempt to explain why it previously provided the exact identifiers used for many of the fields in the EID and IIDS, as well as significant quantities of documentation concerning the databases at issue. *See* Third Declaration of Susan B. Long ¶¶ 2–6 (May 19, 2016) (filed herewith and referred to as "Third Long Dec."). Indeed, ICE's initial response to the request for EID schema was that it had supplied that information in its entirety. Third Long Dec. ¶ 6. It was only after ICE was required, as a result of a remand of one of the plaintiffs' administrative appeals, to conduct a more complete search for and production of such information—and after the plaintiffs brought this lawsuit when the remand resulted in no further response from the agency—that ICE asserted that such information is subject to a blanket exemption from release under Exemption 7(E) on the basis of concerns about circumvention of the law.

The inconsistency of ICE's invocation of security concerns is a telling indication that those concerns are not genuine and that they reflect efforts to inhibit public access to the information in its EID—information that constitutes the official public record of ICE enforcement efforts, including formal, public proceedings and other non-classified, non-exempt information about its activities. Without access to information concerning the structure and content of the EID, requestors seeking access to nonexempt information it contains on matters of public importance are hamstrung in their ability to craft FOIA requests that specifically identify the information sought. *See* Third Long Dec. ¶ 7. Attempts to narrow the request using

descriptions of the information sought, as opposed to the names of the relevant fields from the database, will likely elicit the response that the request is asking the agency to "create" records that do not already exist by substituting descriptions for field names (as ICE's original briefing on the cross-motions for summary judgment in this case indicated). Less focused requests, on the other hand, will, as this Court's partial summary judgment ruling reflects, be rejected by the agency as too burdensome because of the size of the database and the agency's asserted inability to review it in its entirety and redact exempt information. Acceptance of the government's claims would thus have the effect of essentially placing entire repositories of public information beyond the reach of FOIA even though much (if not most) of the information they contain is not even arguably exempt under FOIA.

ICE nonetheless contends that its speculative assertions of a risk that attacks on its systems will be facilitated by the release of database schema and other "metadata" are sufficient because its burden of showing a risk of circumvention under Exemption 7(E) is minimal. But even under the "relatively low bar" established by Exemption 7(E), *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2009), the government must show that the release of information "could *reasonably* be expected" to risk circumvention of the law. 5 U.S.C. § 552(b)(7)(E) (emphasis added). And even under the erroneous view that the structure of a database is a "guideline," "technique," or "procedure" for "law enforcement investigations or prosecutions,"

*id.*,[9] the agency's submissions here fail to show that threats to the integrity of its systems or data could *reasonably* be expected to increase if the requested information were released.

## II.   ICE has failed to demonstrate that it has properly responded to the plaintiffs' request for records identifying and providing information regarding extracts and snapshots of the EID.

ICE's description of its search for and reasons for withholding information responsive to plaintiffs' request for records identifying and providing information about the preparation of extracts and "snapshots" of the EID fails to justify the agency's blanket withholding of records containing that information.

### A.   ICE's description of its search shows that it has made no attempt to provide reasonably segregable, non-exempt portions of records.

ICE contends that it searched specifically for records containing the requested information and then used those records to create a nine-page, partially redacted document released to plaintiffs in place of the release of records responsive to their

---

[9] *See Shapiro v. Dep't of Justice*, __ F. Supp. 3d __, 2016 WL 287051, at * 11 (D.D.C. Jan. 22, 2016) ("'The term "guidelines" ... generally refers in the context of Exemption 7(E) to resource allocation' whereas '[t]he phrase "techniques and procedures" ... refers to how law enforcement officials go about investigating a crime.'") (quoting *Allard K. Lowenstein Int'l Human Rights Proj. v. DHS*, 626 F.3d 678, 682 (2d Cir. 2010)); *see also Citizens for Responsibility & Ethics in Wash. v. Dep't of Justice*, 746 F.3d 1082, 1102 (D.C. Cir. 2014) ("[T]he agency must at least provide *some* explanation of what procedures are involved and how they would be disclosed."); *Elec. Privacy Info. Ctr. v. Customs & Border Prot.*, __ F. Supp. 3d __, 2016 WL 632179, at *4 (D.D.C. Feb. 17, 2016) (holding that agency failed to show that information about use, navigation and capabilities of a computer system would disclose law enforcement techniques or procedures).

request.[10] It provides no *Vaughn* index to the records located in that search and used to create the document it produced, nor does it make claims of exemption specific to those individual records or describe in a particularized way the basis for any conclusion that they contain no segregable, nonexempt information. Moreover, ICE appears to concede that when its initial response to the plaintiffs' request was remanded for a further search, it in fact conducted no such search. Instead, ICE argues that any other responsive information it possesses would fall within the categories of documents in the SLM repository that are generally described in its Supplemental *Vaughn* Index and that no separate search was necessary because those documents are exempt in their entirety.

ICE effectively concedes the existence of responsive records both in the materials it actually searched for and used to create the document it released in response to the FOIA request and, more generally, in the SLM repository. ICE has not carried its burden of demonstrating that either the materials it searched in response to the request or the materials in the SLM repository contain no reasonably segregable, nonexempt information subject to the request. The statute explicitly requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). "This means that all 'non-exempt portions

---

[10] ICE concedes that that document itself was not properly responsive because it was not an agency record but was created in response to the FOIA request. Wilson Supp. Dec. ¶ 6.

of a document must be disclosed unless they are inextricably intertwined with exempt portions.'" *Jett v. FBI*, __ F. Supp. 3d __, 2015 WL 5921898, at *7 (Sept. 30, 2015) (quoting *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)). To meet its burden under this standard, "[t]he agency must provide 'a detailed justification and not just conclusory statements to demonstrate that all reasonably segregable information has been released.'" *Gatore v. Dep't of Homeland Security*, __ F. Supp. 3d __, 2016 WL 1367730, at *3 (D.D.C. 2016) (quoting *Valfells v. CIA*, 717 F. Supp. 2d 110, 120 (D.D.C. 2010)). ICE makes no attempt to satisfy this burden: It has not attempted either to segregate nonexempt information from the records responsive to the request for information about snapshots or to demonstrate that segregation is not reasonably possible.

## B.   ICE has not demonstrated that the requested records are exempt in their entirety and that segregation is therefore unnecessary.

ICE asserts that the information sought in the plaintiffs' request is categorically and entirely exempt under Exemption 7(E) (and with respect to the names of individuals, Exemptions 6 and 7(C)). The government's argument fails both legally and factually. Indeed, the argument is incoherent in light of ICE's own creation and disclosure of a document that purports to summarize information contained in those records.

### 1.   Information about snapshots reveals no guidelines, techniques, or procedures for investigations or prosecutions.

As a legal matter, even accepting this Court's ruling (which we believe to be erroneous) that details about the structure of the databases "qualify … as

enforcement guidelines" insofar as they reveal "identifiers used by law enforcement agencies to conduct, organize, and manage investigations and prosecutions," Mem. Op. and Order, at 13, the materials at issue in the requests for records identifying "snapshots" and providing limited information about their creation fall outside the scope of Exemption 7(E). Disclosures relating to the routine replication of data and its transmission to various institutional users within and outside of ICE would not reveal law enforcement guidelines—that is, directives relating to "resource allocation" among various investigatory and prosecutorial priorities. *Shapiro*, __ F. Supp. 3d __, 2016 WL 287051, at * 11. Nor do such materials reveal investigative or prosecutorial "techniques and procedures," because they do not say anything about "how law enforcement officials go about investigating a crime." *Id.*

>    **2.    ICE has not shown that disclosing records identifying snapshots and records would risk circumvention of the law.**

In any event, ICE's contention that merely identifying the various snapshots it creates would pose a risk of circumvention of the law is unfounded, even assuming that such records would disclose law enforcement guidelines, procedures, or techniques for investigations or prosecutions. ICE begins its argument on this point with a red herring by suggesting that the request seeks *copies* of the snapshots, which this Court's memorandum and order held would be too burdensome to supply. Def. Supp. Br. 18. The request plainly does not seek copies of the snapshots. If it did, this Court would not have ordered a further response addressing ICE's search for documents. Rather, the Court would have held such a response unnecessary, based

on the same reasoning it used to hold that addressing the adequacy of CBP's search for copies of snapshots was unnecessary once it decided that such copies would be too burdensome to produce.

Apparently recognizing the untenability of the assertion that the request seeks copies of the snapshots, ICE argues that producing the records would create a risk of circumvention of the law because it would involve production of "information describing access to EID and sensitive database technical documentation regarding EID" as well as "detailed system analysis of the EID system." Def. Supp. Br. 18–19. ICE asserts that disclosure of such information "could allow someone to understand the design and functionality of the system and therefore undermine it by exploiting a revealed vulnerability." *Id*. at 19.

This Exemption 7(E) argument fails not only because ICE, as demonstrated above, has failed to support its argument that releasing information about the "design and functionality" of the EID can be reasonably expect to pose a risk of circumvention of the law, but also because the argument is directed at information very different from that sought by the request. Identifying the snapshots of the database that ICE prepares and delivers would not involve disclosure of details of EID's "design" or how to "access" it, nor would it require release of "sensitive database technical documentation." And to the extent that *some* records identifying snapshots might *also* contain such "sensitive" information, ICE has not even attempted to show that such information, if exempt from disclosure, could not reasonably be segregated from the parts of the records identifying the snapshots.

Any suggestion that ICE is exempt from merely identifying and describing the snapshots created for and received by various components of ICE and other agencies would fly in the face of the agency's obligations under the Privacy Act, 5 U.S.C. § 552a, which requires each government agency that maintains a system of records with information about individuals (including a computer database such as the EID) to publish information including the identification of "each routine use of the records contained in the system, including the categories of users and the purpose of each use." *Id*. § 552a(e)(4)(D). Identifying instances in which all or part of a database is copied and distributed within or beyond the agency merely fleshes out the exact kind of information that Congress has dictated must be publicly available.

ICE's contention that identifying snapshots would pose risks justifying application of Exemption 7(E) also is at odds with its own disclosures concerning the snapshots it creates. Its Privacy Impact Assessment for the EID (Patterson Dec., Exh. A) identifies some of the snapshots or extracts the agency routinely creates, and ICE's briefing and declarations in this case likewise contain extensive discussions of them. Similarly, the nine-page document created by ICE in lieu of a response to the plaintiffs' request contains information describing the agency's snapshots, effectively conceding, at a minimum, that not *all* such information is exempt. *See* First Long Dec., Exh. F. In addition, in the course of responding to various of plaintiffs' other FOIA requests, ICE has released a large amount of information referring to its preparation of snapshots and extracts. Third Long Dec. ¶ 2. ICE offers no explanation of why this information is not exempt, or of how ICE draws the line between

information that it claims would pose a risk of circumvention and information that would not do so. The agency's release of such information confirms both that records identifying snapshots do not genuinely pose a risk of circumvention of the law justifying a blanket refusal to produce them, and that the agency could reasonably segregate information identifying snapshots from any exempt information, but has not attempted to do so here.

### 3. ICE's claim that other information about the creation of snapshots is exempt also fails.

ICE also contends that insofar as plaintiffs' request seeks to determine who was responsible for preparing extracts and snapshots, and who received them, Exemptions 6 and 7(C), in addition to 7(E), apply because the responsive records would include the names of individuals. Again, ICE's response is unwarranted on a number of levels. ICE's responses to other requests concerning its databases have revealed the names of a large number of government employees (with *contact* information redacted). *See* Third Long Dec. ¶ 9. ICE offers little explanation of how the information that an individual is involved, as part of his or her *official* duties, in particular tasks involving data extracts, involves a *personal* privacy interest, or of how the identification of an individual *without contact information* could involve the harms ICE hypothesizes.

More importantly, ICE overlooks that names of particular individuals are not the only information responsive to a request that it provide records indicating who creates and receives extracts. The names of the components of ICE that undertake the extraction tasks, and of the offices inside ICE and other agencies that receive

them, are also responsive, and such information implicates no rights to "personal privacy" that could trigger Exemption 6 or Exemption 7(C): A government office has no "personal privacy." *See FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011) ("'Personal' in the phrase 'personal privacy' … suggests a type of privacy evocative of human concerns—not the sort usually associated with an entity …."). And to the extent responsive records might contain individual names as well as the identification of agency components that create and receive extracts, names, if exempt, are quintessentially segregable bits of information that are regularly redacted from government records when genuine privacy concerns are implicated.

ICE makes a feint at arguing that even the identity of offices that create and receive snapshots or extracts of the EID is exempt under Exemption 7(E) because that knowledge would create a risk of circumvention of the law. The argument, again, rests on ICE's more general contention that information about the nature of the databases could assist cyber-attackers, and it shares all the flaws in that argument outlined above. The argument is particularly unwarranted with respect to the information at issue here because the government's declarations provide no support for the argument that the mere knowledge that a particular component of an agency disseminates or receives a data compilation creates a reasonable threat that the agency will be subject to a data breach. Even if the government's declarants sought to advance such an extreme view, that view would run directly counter to the Privacy Act's requirement that the government publish "the categories of users" of databases as well as "practices of the agency regarding storage, retrievability, access controls,

retention, and disposal" of such records. 5 U.S.C. § 525a(4)(D) & (E). It would be paradoxical at best to conclude that the exact kinds of disclosures required by the Privacy Act create a risk of circumvention of the law sufficient to call Exemption 7(E) into play.

ICE's defense of its failure to produce records concerning the frequency with which it prepares extracts, and the amount of system time required for their preparation, rests principally on its interpretation of the requests to seek records concerning the *exact dates and times* when snapshots are prepared, which ICE contends are subject to Exemption 7(E) because they would tell a potential cyber-attacker "exactly what time to stage an attack." ICE Supp. Br. 26. Again, ICE neglects that records providing much less detail are responsive to the request, and it overlooks entirely the possibility of redaction of exact start times and dates when activities occur.

In any event, ICE's security arguments are, again, unpersuasive. ICE rests on the generalization that knowing when something occurs makes it easier to target an attack at that activity, without regard to whether a risk can be *reasonably* expected in light of the many security measures ICE uses when making extracts. Those measures, according to ICE's own description of the database, include the use of encryption and a secure file transfer protocol for the extracts, as well as extensive measures to prevent unauthorized access to EID. Patterson Dec., Exh. A, at 18, 22. ICE's declarants do not establish that, in light of these controls, knowing when ICE

prepares extracts (let alone merely knowing *how often*) could be reasonably expected to create a risk of circumvention of the law.

Indeed, the insubstantiality of that risk is exemplified by ICE's own decision to include in the document it created as a substitute for a response to the plaintiffs' FOIA request the exact days, and start and stop times, when a number of extracts are prepared from EID. First Long Dec., Exh. F. ICE provides no explanation at all, let alone an understandable one, for why the information it has provided poses no security risks, but exactly the same kind of information in records it is refusing to supply is exempt.[11]

### 4.     ICE's invocation of the "mosaic" theory is unfounded.

Finally, ICE resorts to the "mosaic" theory to bolster its claim that information regarding snapshots and extracts should be treated as exempt under Exemption 7(E) because of the possibility that disparate pieces of information, apparently insignificant in isolation, taken together may "increase significantly" the "likelihood of an attack." ICE Supp. Br. 26. ICE's argument exaggerates the degree to which the plaintiffs' modest request for identification of snapshots and basic information about how often they are produced and where they are sent would provide "an advanced knowledge of the internal environment of a database system."

---

[11] The inclusion in the nine-page document of stop times and start times also undermines ICE's assertion that it has no records that contain stop times from which the system time for various snapshots and extracts can be determined. ICE suggests that the source of the information was not records, but personal knowledge, but immediately contradicts that assertion by stating that the information in the document it prepared was "extrapolated" from "system audit logs." ICE Supp. Br. 25.

*Id*. And the argument proves both too little and too much. It offers no explanation to differentiate the significant information the agency has already provided from the information it now chooses to withhold. And taken seriously, it would permit the agency to withhold any information about its data systems, or about any of its law enforcement and other activities, based on the assertion that, together with other information, they could be useful in some way to a potential criminal.

Acceptance of such arguments would have broad and highly undesirable consequences. The databases at issue, again, are the official records of the agencies actions, including public proceedings. And agencies are required by law to provide the public with substantial information about the nature of such databases. But the government's argument would place beyond the reach of FOIA much if not all of the information in such government data compilations—an outcome that, as the government increasingly makes use of large databases for the storage and retention of information critical to the public's understanding of its activities, would fundamentally subvert the values of openness and access that FOIA embodies.

## CONCLUSION

For the foregoing reasons, ICE's motion for summary judgment as to the application of Exemption 7(E) to the database schema and other metadata at issue, as well as with respect to issues concerning the plaintiffs' request for records identifying and providing information about the creation of snapshots, should be denied. The plaintiffs' cross-motion for summary judgment on those issues should be granted.

/s/ Scott L. Nelson
Scott L. Nelson
DC Bar No. 413548
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

May 20, 2016

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing supplemental memorandum was served on counsel for the defendants via the court's electronic filing system on May 20, 2016.

/s/ Scott L. Nelson
Scott L. Nelson