UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SUSAN B. LONG, et al.            )
                                 )
        Plaintiffs,              )
                                 )
    v.                           ) No. 1:14-CV-00109-APM
                                 )
                                 )
U.S. IMMIGRATION AND             )
CUSTOMS ENFORCEMENT, et al.      )
                                 )
        Defendants.              )
                                 )

SUPPLEMENTAL DECLARATION OF J. THOMAS FOSTER
IN SUPPORT OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY'S
MOTION FOR SUMMARY JUDGMENT

I.      INTRODUCTION

I, J. Thomas Foster, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.  I am an Information Technology (IT) Specialist with a concentration in Information Security in the Office of the Chief Information Officer Information Assurance Division at U.S. Immigration and Customs Enforcement (ICE). I have held this position since August 10, 2015. Prior to this position, I was a Senior Security Consultant with the MITRE Corporation supporting the U.S. Department of Homeland Security (DHS) and U.S. Department of Health and Human Services (HHS) from January 2011 until August 2015. From February 2008 until January 2011, I was responsible for running the Security Exchange Commission (SEC) (SAIC) Security Operation Center (SOC) activities. From August 1999 until February 2008, I served as the Director of Information Security at Fannie Mae. In addition, I have held intelligence positions within the U.S. Department of Defense (DoD) since 1985. Specifically I held intelligence positions with the Defense Information Systems Agency from 1994 until 1999 and the Office of Naval Intelligence

from 1985 until 1994. I am a Certified Information System Security Professional (CISSP) from the International Information Systems Security Certification Consortium, Inc., [(ISC)²®].

2. ICE OCISO is responsible for the overall security of the ICE technological and operational environment, including systems, user access, internal and external compliance, and security authorization of IT systems. The division oversees the entire IT Security program including: managing ICE compliance with all Federal laws and regulations pertaining to IT security; monitoring and maintaining institutional knowledge on emerging Federal security trends and threats; directing ICE's Cyber Security Program, and supporting other Office of the Chief Information Officer (OCIO) programs and projects to ensure IT Information Security. The ICE OCISO mailing address is 801 I Street, N.W., Washington, D.C. 20536.

3. As an Information Security IT Specialist in ICE OCISO, my official duties are Cyber Threat Intelligence, SOC operations, and incident response.

4. I make this supplemental declaration in support of ICE's Motion for Summary Judgment in the above-captioned action. The statements contained in this declaration are based upon my personal knowledge, my review of the technical information requested by the Plaintiff, federal information security requirements and standards, Dr. Paul C. Clark's declarations dated November 13, 2014 [Doc. 19-3, filed November 13, 2014], March 26, 2014 [Doc. 27-2, filed March 30, 2015], and May 17, 2016 [Doc. 37-2, filed May 20, 2016], recent publicly-available reports on cyber-attacks directed at the federal government, the Court's Order dated December 14, 2015, as well as, information provided to me during the course of my official duties.

5. This supplemental declaration incorporates by reference my original declaration dated January 14 2016 [Doc. 32-3 filed February 2, 2016] and is intended to address "observations with respect to [the Government's] latest arguments that disclosing certain records requested by plaintiffs at issue…will place [the Government's] systems at increased risk of a cyber-attack," which were made by Dr. Paul C. Clark in his declaration dated May 17, 2016. Doc. 37-2 filed May 20, 2016.

2

6. As previously stated, my original declaration dated January 14, 2016 [Doc. 32-3 filed February 2, 2016] was intended to **supplement** the October 8, 2014 Declaration of Karolyn Miller (Doc. 17-1 filed October 9, 2014) and the January 12, 2015 Supplemental Declaration of Jeff Wilson (Doc. 25-1 filed January 28, 2015) to **explain in further detail** how the disclosure of technical documentation (records identifying each and every database table, descriptions of all fields of information stored in each of the database tables, records defining each code used in recording data, database schema, and records identifying the database software) requested by the plaintiffs that pertains to the U.S. Immigration and Customs Enforcement's, Enforcement Integrated Database (EID) and the ICE Integrated Decision System Database (IIDS) could reasonably be expected to risk a cyber-attack against the Agency's databases and/or other circumvention of the law.

7. The supplemental information contained in my declaration dated January 14, 2016 does not in any manner diminish or negate the information contained in either the declaration of Karolyn Miller (Doc. 17-1 filed October 9, 2014) or the January 12, 2015 Supplemental Declaration of Jeff Wilson (Doc. 25-1 filed January 28, 2015).

8. Structured Query Language injection attacks (SQLIA) are one of many types of malicious intrusions. SQLIAs are one of the most prevalent types of web attack because they are effective, fast, easy, and can quickly provide a malicious intruder with valuable information. But they are not the only form of a malicious intrusion, all of which are informed by the disclosure of the exact type of information sought by the Plaintiffs. Because the success of SQLIA is dependent in large measure on the attacker's ability to access and utilize technical information to extract additional information or gain greater access to an information technology system like EID/IIDS, the disclosure of the database schema, tables, codes, code values, and database version for the EID and IIDS databases systems, as requested by the Plaintiffs, would disclose the exact information that an SQLIA attacker would need to penetrate the EID and IIDS databases and

3

systems despite the lack of a web interface and could reasonably be expected to risk a cyber-attack against the Agency's databases and/or other circumvention of the law.

9. Despite assertions in the May 17, 2016 Paul C. Clark declaration, a publicly accessible interface to EID or IIDS is not required to expose data contained in internal systems to malicious intrusions. The Agency's databases are at an increased risk of SQLIAs, phishing, advanced persistent threat intrusions, spear phishing, and other forms of malicious intrusions, as well as the subsequent theft of data, data corruption, data erasure, and/or data modification, if the technical documentation (database schema, tables, fields, etc.) pertaining to EID and IIDS is released to the public at large.

10. Paragraph 7 of the May 17, 2016 Paul C. Clark declaration, states that "[n]o evidence presented demonstrates a vulnerability that is made more exploitable by the disclosure of database schema information." However, it is well known that vulnerabilities exist in all information technology systems at some level and that skilled cyber attackers study network diagrams, database schema, database tables/fields, metadata and software versions to identify the most vulnerable entry points to sensitive systems and data, and to gather other technical information about the systems. The more detailed information the cyber attacker can acquire, the more likely it is that they will be able to conduct a SQLIA or successfully execute phishing/spear phishing campaigns. This in turn provides malicious intruders with unauthorized access to sensitive databases such as EID and IIDS through which they can continue to utilize the technical documentation to harm the systems.[1]

---

[1] See *Hacker's Choice: Top Six Database Attacks*, http://www.darkreading.com/risk/hackers-choice-top-six-database-attacks/d/d-id/1129481 (Accessed June 6, 2016) "Database vendors are careful not to disclose many **details about the vulnerabilities** their patches fix for fear of tipping off attackers, but organizations still struggle with the massive manpower and time it takes to test and apply a database patch. Patching requires the painstaking task of testing all applications affected by the patch, for instance"; *5 Ways Hackers Gain Access to Your Data*, http://www.mydigitalshield.com/5-ways-hackers-gain-access-data/ (Accessed June 6, 2016) "Within your company, it's important to provide ongoing training and education about these types of attacks. This is the best method for keeping employees from unintentionally providing information that could compromise your business network. Another common phishing scam involves the hacker contacting a target and advising them that they have been the victim of a scam. The perpetrator offers to help the target and asks them for the very same confidential information – such as social security numbers and banking details – they are claiming has been stolen. Remind team members to be on the lookout for suspicious e-mail attachments, pop-up screens asking for personal information, and hackers posing as authority figures looking for personal or confidential data…".

4

11. Paragraph 8 of the Paul C. Clark May 17, 2016 declaration asserts that the two examples (OPM and LEEP breaches) provided in the J. Thomas Foster declaration dated January 14, 2016 are anecdotal and therefore provide no evidence to support the assertions about the risks posed by the disclosure of database schema. It should be noted that every theory of attack vectors in a computer breach is anecdotal and the review of prior breaches provide very valuable information for the future of database security and support the Government's position that the release of technical documentation increases the risk of future cyber-attacks or other circumventions of the law. Dr. Clark further argues that the two illustrative examples do not "demonstrate that an attacker can gain access without an external point of access," which is simply a misunderstanding of the Government's position in this case. From a database security perspective the issue is not whether an attacker can gain access without an external point of access using the database schema. Databases can be accessed with or without an external point of access – this is simply a matter of how the intruder chooses to make access. An intruder does not need external access to a database to obtain unauthorized access to a system such as EID or IIDS via phishing or other social engineering methods. Unauthorized access is facilitated when an intruder has access to the technical documentation about a database, which in part provides the categories of information that are held within database tables [personally identifiable information, status of actions, names of ICE employees associated with records] and how the database tables are interrelated and connected. Technical documentation also provides information regarding the types of access [user only versus privileged, which allows for deletion or modification of data], audit log data from which patterns of use by employees can be derived, and data sources imported from other systems. All of this information allows a malicious intruder to study key vulnerabilities and become well-versed in the database itself. This knowledge increases the likelihood that

unauthorized access will be successful and the intruder can further the attack from inside the database armed with all of the technical documentation in a timely fashion.

12. Paragraph 8 of the May 17, 2016 Paul C. Clark declaration also appears to argue that the release of database schema pertaining to the OPM system played no role in that particular breach without offering any authority for the proposition. In addition, the declaration asserts that the OPM breach example wherein the public gained access to a closed network through an authentication failure supports Plaintiffs' position that there must always be external access in order for there to be an increased risk of circumvention of the law. The fact of the matter is that unauthorized access can occur in a variety of ways as described in declarations[2]; this unauthorized access can be facilitated by a detailed study of publicly released database schema and technical documentation; and that once the intruder obtains unauthorized access to a system it does not matter where there was or was not an externally facing interface to the network. Once in the system, an intruder with nefarious intent can corrupt, modify, erase, delete data; cause a denial of service; and/or exfiltrate sensitive data for unauthorized release.

13. Paragraph 10 of the May 17, 2016 Paul C. Clark declaration disputes the relevance of the concept of "least privilege" to the case at issue. However, disclosing information pertaining to administrative rights and privileges to the public could reasonably be expected to result in the circumvention of law. Providing malicious intruders with advance notice of this information could assist in the escalation of privileges. Least privilege is not just about having the right permissions on a system to do your job but also that you have a need to know aspects of the system that are not commonly shared within the enterprise as a whole. This information would make reverse engineering infinitely easier. Knowing which tables are part of the database, what

---

[2] Declaration of Karolyn Miller In Support of the United States Department of Homeland Security's Motion for Summary Judgment, Doc. 17-1, Filed 10/09/14; Declaration of J. Thomas Foster In Support of the United States Department of Homeland Security's Motion for Summary Judgment, Doc. 32-3, Filed 2/02/16.

6

is contained in those tables, and how the tables are linked together would make it easier for an attacker to pinpoint the most valuable information – especially if they are by-passing the front application and working directly against the database.

14. Lastly, Paragraph 11 of the May 17, 2016 Paul C. Clark declaration dismisses the concept of "defense in depth" for establishing the security of information technology systems and asserts that "defense in depth" has been abandoned in favor of integrated countermeasures. "Defense in depth" has not been abandoned by IT security professionals and it is still a basic security practice since advancements in technology and experience have eliminated any degradation of service. Integrated countermeasures cited as the newly accepted security principle by Dr. Clark is simple another term for "defense in depth."

15. **JURAT CLAUSE**

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief. Signed this  23rd  day of June 2016.

JAMES T FOSTER
Digitally signed by JAMES T FOSTER
DN: c=US, o=U.S. Government, ou=Department of Homeland Security, ou=ICE, ou=People, cn=JAMES T FOSTER, 0.9.2342.19200300.100.1.1=0107326331.ICE
Date: 2016.06.23 15:03:13 -04'00'

J. Thomas Foster,
IT Specialist (Information Security)
Office of the Chief Information Security Officer
Office of the Chief Information Officer
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
801 I Street, N.W., Mailstop 5804
Washington, DC 20536