UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN B. LONG, *et. al.*,<br>  Plaintiffs,<br>v.<br>IMMIGRATION AND CUSTOMS<br>ENFORCEMENT, *et al.*,<br>  Defendants. | Civil Action No. 1:14-cv-109 (APM) |

**FOURTH DECLARATION OF SUSAN B. LONG**

I, Susan B. Long, declare as follows:

1.  As set forth in my first declaration in this case, dated November 13, 2014, I am one of the plaintiffs in this action and am co-director of the Transactional Records Access Clearinghouse (TRAC) at Syracuse University. This is my fourth declaration in this case. I make this declaration on my own personal knowledge.

**A.  The Government Has Released Massive Quantities of Records It Now Contends Create a Serious Security Breach.**

2.  My previous declarations demonstrate that defendants have released extensive quantities of records that they now contend "did at the time, and still [do] today, pose a reasonable and significant risk of a database compromise." Wilson 2017 Dec. ¶ 8. Accompanying my previous declarations were a range of illustrations consisting of small excerpts from this massive volume of releases. *See* First Long Dec. ¶¶ 12-21; Second Long Dec. ¶ 3-8; Third Long Dec. ¶¶ 2-9. The selected examples "are illustrative of the types of information that ICE and CBP have routinely provided." Second Long Dec. ¶ 8. It is not true that previous disclosures were limited in scope or were mere samples of the disputed records in this case.

3.  As a data research center that focuses on obtaining internal administrative records from federal agencies, we use the Freedom of Information Act extensively. Because of the large

volume of FOIA requests we submit, TRAC maintains internal database tracking systems to keep tabs on the FOIA requests and administrative appeals we submit along with the responses we receive from federal agencies. In reviewing our records of FOIA requests, appeals and responses to and from Immigration and Customs Enforcement (ICE), I found over 2,226 separate entries over the last decade. Each request, appeal, and agency response represents a separate entry. At times a request may involve multiple appeals, but this count does not include court filings or proceedings. Based upon my review I found that approximately ninety-five percent of these concern requests and responses that specifically dealt with documentation and data encompassing the "actual database table names, actual table attribute (data elements) names, data formats/type [or] actual code values" that Mr. Wilson states create a serious security breach if released. Wilson 2017 Dec. ¶ 10a. The vast majority of the records ICE has released in response to these requests have included one or more of these specific categories of information. By any measure, ICE past releases of this information have been voluminous, indeed massive.

**B.      Past Releases Were Not Inadvertent.**

4.      ICE's past releases of the specific categories of information that defendants now claim create a serious security breach cannot be described as accidental, unintentional, or inadvertent. They were not simply the result of an inadequately trained office clerk. On more than a hundred occasions, these releases occurred only after TRAC took an administrative appeal to the head of the agency (sometimes with the support of legal arguments presented by an attorney) and received a decision by ICE's Office of the Principal Legal Advisor. A number of releases of materials the government now claims pose a serious security risk only occurred after review at the Department of Homeland Security headquarters when we sought its review of the matter. And, as my second declaration noted, we at times went to court to obtain such records

(¶¶ 3-4) or sought assistance from the Office of Government Information Services (OGIS), the ombudsman tasked with resolving FOIA disputes to avoid litigation (¶ 13).

5. As I described in prior declarations, defendants on numerous occasions disclosed technical documentation concerning the EID and IIDS databases, including data field and table names, database schema, code translation tables and other technical information including actual code values, without any suggestion that these disclosures risked cyber-attacks. Such releases began as far back as 2008 and have continued. For specific examples see ¶¶ 7-8 of my Second Declaration and accompanying exhibits. These releases, as documented in the referenced exhibits, were prepared by staff of the Enforcement and Removal Operations ("ERO") Law Enforcement and Systems Analysis ("LESA") office in which defendants' declarant, Mr. Wilson, is employed. Further, releases that only took place after appeal to the head of the agency occurred throughout this entire period and have continued up until present.

**C. Defendants' Purported Chronology Is Inconsistent with Its Actions in This Case.**

6. The purported chronology of the "discovery" in June 2013 of alleged "inadvertent releases" and ICE's claimed immediate implementation of a blanket policy to ensure the protection and withholding of any and all records containing references "to actual database table names, actual table attribute (data elements) names, data formats/type and code values" (Wilson 2017 Dec. ¶¶ 9-10) are inconsistent with ICE's actual actions in this very case.

a. This lawsuit was originally necessitated not because ICE contended that EID database schema were broadly exempt, but because it contended ICE "had provided [to TRAC] copies of the [database] schema and all code tables for the entire EID, including all of its modules." Pineiro 2014 Dec. ¶ 10. In response to our appeal of a denial based on that contention, ICE's Office of the Principal Legal Advisor on July 22, 2011, had remanded directing the agency

to conduct a search to ensure that all responsive records had indeed already been released. Pineiro 2014 Dec., Exh. 7.

      b.      The current lawsuit was not filed until January 29, 2014, long after Mr. Wilson's purported discovery. But neither before nor after June 2013 did ICE act on this long outstanding FOIA remand or communicate to TRAC any assertion that release of further information in response to the subject request would pose a significant security risk.

      c.      After suit was filed, ICE again initially failed to make any claim that further releases of EID documentation would pose the threat of a serious security breach. No such claim was made in its initial Vaughn Index filed June 18, 2014, purporting to provide a comprehensive listing of all records it was withholding. The June 2014 Vaughn index limited its exemption claims to a very small number of specific element names that were redacted from IIDS documentation. As discussed in my third declaration (¶ 3), ICE released most of the IIDS database documentation without any redactions, although its contents included extensive lists of names of database elements, large color-coded schematic diagrams displaying IIDS database components with their actual names, and the precise DBMS software (Oracle 10g, Version 10.2.0.4) used by the IIDS. Sample pages of documents covered by the Vaughn Index were attached to my prior declarations. For illustrative pages identifying records released in their entirety, see Exhibits H and I of my first declaration, and for an illustrative page showing release of names of data elements with only a few redactions, see Exhibit U to my third declaration. The October 1, 2014, declaration of ICE FOIA Officer Fernando Pineiro (¶ 24), which sets forth the legal grounds for the defendants' withholding of materials listed in the initial Vaughn index, states that the defendants' position was taken in consultation with "ERO, in conjunction with

OCIO [ICE Office of Chief Information Officer],″ and does not allege that the material that had been released up to that point posed any risk of a security breach.

**D.      Claims of Security Risk Are Inconsistent with Defendant's Actual Withholding.**

7.      Plaintiffs' purpose, as professors at Syracuse University and co-directors of TRAC, in seeking the records involved in this lawsuit is described in my first declaration (¶¶ 2-3). Although plaintiffs for over a decade, and with great persistence as the volume of requests and appeals noted above attest, have used FOIA seeking detailed case-by-case records (in anonymous form) from the defendants to determine what the government is actually doing to enforce the immigration laws, we have encountered and continue to encounter endless problems in obtaining access to these public records, even though the defendants do not claim that this information is itself exempt from disclosure. As a result we have been unable to obtain the information needed to answer vital questions that the public continually ask and which lie at the heart of ongoing public debates about immigration enforcement policy and agency activities.

8.      The database schema sought in this lawsuit are technical documentation that list the items of information the databases track. These listings are essential to obtaining access to existing public records containing factual information critical to understanding immigration policy debates that currently occupy the headlines. These database schema are not restricted to listings of exact technical database names; they also include parallel listings in ordinary English describing the information that is recorded in a given table, field, and cell, so that what is being discussed is understandable to the reader. The EID database schema that ICE admits were previously provided to TRAC make clear that ICE's database schema contain such descriptive information. My third declaration, at ¶¶ 4-5, and the accompanying exhibits provide illustrative examples.

9. ICE refuses to release these portions of the database schema despite its admission that "descriptive terms for the fields of information," in contrast to "specific field names," can be released without "compromis[ing]" "database security." Wilson Jan. 12, 2015. Dec.¶ 8.

10. Without these listings, what plaintiffs encounter when seeking data from ICE about the agency's actual enforcement activities is a Catch-22 situation. When we ask for an existing "snapshot" of the data, a copy of an existing database, or other broad descriptive categories of data, we are either told that technical difficulties prevent them from making a copy (as in the current case), or ICE refuses to process our request at all. However, when we itemize and describe specific fields of information we are requesting, many of the requested items of information are often not provided. The agency's standard response letter only tells us that whatever it produces were the records located as a result of its search. When we persist we sometimes are able to obtain an explanation for a specific requested item that was not provided. However, that explanation almost invariably consists of the bare assertion that information is "not available," or "not tracked." It is difficult—if not impossible—as a practical matter to challenge such assertions without hard evidence from the government's own files documenting that the information does exist. Indeed, even when our requests seek data (as opposed to database schema or other metadata) on particular agency activities contained within the EID and IIDS databases, the government has refused to process requests on the purported ground that they "seek the same information that is the subject of [this] current litigation." Indeed, ICE's latest refusal, citing these grounds, arrived yesterday concerning data on its use of ICE detainers. Yet

the agency's use of detainers lie at the heart of current policy debates over the "sanctuary city" movement[1] where some state and local governments refuse to honor these requests.

**E.     Ongoing Disclosures Belie Alleged Security Risks of Disclosing Remaining Records.**

11.     The defendant does not dispute that it has disclosed the very information that it now claims poses a serious risk of a security breach. However, it seeks to distinguish the records now in dispute with these disclosures on the grounds that the information now in dispute is both more current and complete. Because of this, it posits that any additional release increases the risk of a security breach. The factual premises of this argument are baseless.

12.     Defendants' assertions rest on the premise that prior disclosures long ago ceased and were limited to a "small subset of the information and documentation that Plaintiffs currently seek." Wilson 2017 Dec. ¶ 12. As I have discussed above, defendants' disclosures of identical types of records have been extensive—indeed massive. They have also been ongoing and have continued to the present. For example, in the last thirty days, in response to TRAC's FOIA requests to ICE for current information we have received thirteen new releases with the equivalent of thousands of pages containing actual database field names, the actual contents of database auxiliary lookup tables, and countless actual code values—the very information that the defendant claims poses a serious risk of a security breach. Given the volume of our requests, this volume of releases is not unusual.

13.     In contrast, according to Wilson's October 2014 declaration (part III) , the most recent search for the records currently in dispute was conducted on July 15, 2014, more than two-and-a-half years ago. Many of the documents located appear to include historical materials

---

[1] For an overview of this public policy debate see the Washington Post, January 25, 2017, "How sanctuary cities work, and how Trump's executive order might affect them" by Daria Cameron at: https://www.washingtonpost.com/graphics/national/sanctuary-cities/.

of a much earlier date since they were part of the "system lifecycle management (SLM) repository" that spans the life of systems that have been in existence for many years. Such information is itself "no longer identical to the information as it would appear today." Def. Second Supp. Br. 3.

14. We cannot know which of the documents now in dispute contain information identical to that already released, because the government's Vaughn indices and declarations for the most part do not identify specific records, but only broad categories of records.

15. Defendants concede, however, that ICE previously released extensive documentation covering all EID modules as well as extensive IIDS documentation, and thus it is highly likely that many withheld records contain specific information that is the same as what we have already received.

Pursuant to 28 U.S.C. § 1746, I hereby certify under penalty of perjury that the foregoing is true and correct.

Executed in Syracuse, New York on March 10, 2017.

Susan B. Long